## BOONE v. BOONE.

### Opinion delivered June 22, 1914.

1. WILLS—TESTAMENTARY CAPACITY—OLD AGE.—Old age, physical infirmities, and even partial eclipse of the mind, will not prevent a testator from making a valid will, if, at the time he executed the same, he knew what he was doing, and if he could retain in his memory without prompting, the extent and condition of his property and comprehend to whom he was giving it, and at the same time was capable of appreciating the deserts and relation to him, of others, whom he excluded from participation in his estate.

2. WILLS—TESTAMENTARY CAPACITY—SUFFICIENCY OF EVIDENCE.—Testator, a man past seventy years, by will left the bulk of his property to his wife, but devised a tract of thirty acres to a city for a public park. In an action by testator's heirs to have the will declared void for lack of testamentary capacity, held, under the evidence, that the testator had testamentary capacity to make the will.

3. WILLS—SIGNATURE—SPELLING.—In an action contesting the validity of a will, where no contention is made that the testator did not intend to, or did not sign the will, where the will consisted of sev-

eral typewritten sheets, the fact that the testator, whose name was Emanuel, omitted the "n" in his name in writing his signature on one sheet of the will, will not affect its validity.

4.  Wills—designation of beneficiary—names.—The designation in a will of the testator's son's son, as his nephew, instead of his grandson, will not affect the validity of the will, when he gave the names of both, the error being merely clerical.

5.  Wills—names of descendants—omission.—In an action contesting a will on the ground of lack of testamentary capacity of the testator, when the testator neglected to mention the name of one granddaughter, it is not error for the court to refuse to submit to the jury the question of the rights of said granddaughter, where no contention is made by any one that the will was not ineffectual as to her.

6.  Appeal and error—failure to instruct jury on certain issue.—When appellant failed to ask the court to instruct the jury upon a certain issue, it can not, on appeal, complain of the court's failure to do so.

7.  Wills—contest—failure of devise.—In an action contesting a will for lack of testamentary capacity in the testator, the question of the capacity of a certain devisee to accept a gift, is not an issue properly before the court.

Appeal from Pulaski Circuit Court, Second Division; *Guy Fulk,* Judge; affirmed.

*Mehaffy, Reid & Mehaffy,* and *Carmichael, Brooks & Powers,* for appellants.

1.  Supporting the proposition that the evidence does not sustain the verdict and that the court should have directed a verdict for the contestants, counsel say:

(*a*)  The will indicates that the deceased did not appreciate the relationship of those dependent upon him. He was suffering from *senile dementia,* lacked mental capacity and disposing memory, and was not capable of executing a valid will.  64 Ark. 351.

(*b*)  He could not retain in his memory, without prompting, the extent and condition of his property, nor comprehend to whom he was giving it.

(*c*)  There is such indefiniteness and uncertainty about the will as to stamp it as the product of a disordered mind, as, for example, his inability to spell his name correctly; in bequeathing the land for park purposes, although it almost borders the corporate line of

the city of Argenta, that city is not named, and his mania for the use of the letter E as an initial, naming his son, Joseph *H.* Boone, as Joseph *E.* Boone, and referring to Sarah *E.* Abeles and Sarah *E.* Boone, both names referring to the same person, and the initial E not being a part of her name at all.

(*d*)   The other evidence conclusively establishes the mental incapacity of the testator.   87 Ark. 243.

2.   The court erred in holding that the city of Argenta had the legal capacity to take and hold, for *park purposes,* property situated without its limits.   Kirby's Dig., § § 5442, 5449, 5530.   Section 5436, which authorizes municipalities to possess and hold real and personal property, has reference to property within the city limits, except where express authority is given to go beyond the limits.

See also 3 Dillon, Mun. Corp. (5 ed.), § 980; 99 Ark. 704; 58 Ark. 270; 52 Ark. 541; 83 Ark. 275; 113 Am. Rep. 1056; 40 L. R. A. 829; 118 Ga. 590; 118 Wis. 298; 48 L. R. A. 331; 36 Mich. 474.

3.   The court erred in refusing to instruct the jury that deceased died intestate as to his granddaughter, Lucy Russel, who was not mentioned in the will, and as to the property attempted to be conveyed to the city of Argenta.

*J. W. Blackwood* and *Fred McDonald,* for the city of Argenta; *Bradshaw, Rhoton & Helm,* for the executrix.

1.   The questions involved in this case were questions of fact, and, the jury having passed upon them against the contentions of the contestants and in favor of the validity of the will, their verdict is final and conclusive.

The small mistakes in the wording of the will, and isolated acts or conduct on the part of the testator, enlarged upon by counsel in subdivisions A, B and C of their brief, are entirely reconcilable with a sound and disposing mind and memory.

On the question of testamentary capacity as applicable to the deceased under the evience, see 47 Am. St.

354; 28 Am. & Eng. Enc. of L. 74; 3 Wash. (U. S.) 585. Old age and feebleness are not sufficient to destroy testamentary capacity where the testator's mind meets the test of competency. 40 Am. & Eng. Enc. of L. (2 ed.) 87; 13 S. W. (Ark.) 1098; 47 Ala. 221.

"The test is integrity of the mind, not the body." 22 Tex. App. 22; 49 Ark. 369.

An imperfect or illegible signature may be valid as the testator's mark, where there is no doubt of testamentary intent. The omission of the letter "n" from the name of Emanuel, does not tend to invalidate the will, since there is no contention that deceased did not intend to sign his proper name to the will. 40 Cyc. 1107; 148 Pa. St. 55; 35 L. R. A. 103; 28 S. W. 151.

Courts will reconcile apparent inconsistencies and repugnant provisions of a will in order to carry out the testator's intent as to the disposition of his estate. 30 Am. & Eng. Enc. of L. (2 ed.) 685; see also *Id.* 682; 1 Paige (N. Y.) 291; 3 Redf. (N. Y.) 31; 31 Wash. 643.

2. A city may properly accept a devise of land for park purposes. 3 Dillon, Mun. Corp. (5 ed.), § 980; 29 Mo. 574; 170 Mass. 160; 161 Mo. 34; 205 Mo. 656; 118 Wis. 298; 69 Miss. 887; 76 N. Y. 487; 69 N. Y. 569. See also 70 Ark. 455; 100 Ark. 588; 47 Ark. 269; 67 Ark. 36; Acts 1913, p. 323.

3. It was conceded that as to Lucy Russell, the testator died intestate. The court correctly refused to place her claims before the jury. Her rights, as a matter of law, were preserved in the judgment.

KIRBY, J. This is a contest of the will of Emanuel Boone. The testator gave to his children and grandchildren, named in the will, $5 each, and to Emanuel Boone, the son of William H. Boone, designated in the will as his nephew, $100, and left the bulk of his estate to his widow, Sarah Boone, who was named executrix of the will. He disposed of his home place, containing thirty acres, by paragraph 4 of the will as follows: "I hereby devise and bequeath my home place, containing thirty (30) acres, more or less, to my wife, Sarah Boone,

to be held by her for her sole use and benefit during her natural life, and at her death I desire that said land be turned over to the proper authorities of the city nearest to said land for the purpose of a public park (and that the same be maintained as a public park) under the name of "Boone Park," for the use and benefit of the public, forever, by said city; but I desire that they do not disturb the natural outlines of the land more than is necessary to make driveways through and over said land." In the seventh paragraph, he devised thirty-five (35) acres of land to his wife so long as she should remain single, authorizing her to sell it, or any part thereof, during her widowhood after it was first appraised by three persons, naming them, and directing that out of the proceeds, after paying the expenses, she should retain one-third and divide the other two-thirds equally among his heirs, named in section 2 of the will.

W. H. Boone *et al.* filed a contest, alleging as grounds therefor:

*First.* That the testator was without testamentary capacity, and not of sound and disposing mind and memory.

*Second.* That he was unduly influenced by his wife and Charles Vestal and others unknown.

*Third.* Denied the capacity of the city to take and hold the land proposed to be granted for a park under the laws of the State, and alleged other inconsistent provisions of the will.

The will was admitted to probate by the probate court, and upon appeal to the circuit court a trial by jury resulted in favor of its validity, and from the judgment this appeal is prosecuted.

The testimony is voluminous, and, upon the question of testamentary capacity, conflicting and contradictory.

Upon the part of the contestants, children, relatives and heirs, it tends strongly to show that the testator was weakened in mind and body with the weight of years; that he had suffered two strokes of paralysis along about 1903 and 1904, which further impaired his mind, and that

the effect of the last was decidedly noticeable by the drawn condition of his face and the twitching of the muscles. That his memory was impaired to the extent that in June, 1904, he failed to recognize one of his children, Mrs. McClellan, on Main Street until after she had shaken hands with him and called him "father," and "He recognized me then and cried and wiped the tears from his eyes" and said that he failed to recognize another on another occasion, and that he had forgotten and did not recognize a grandchild until she called his attention to her identity.

Some of these witnesses stated that the Faucettes, who had been mayors of Argenta, were frequent visitors at the house of the testator before the making of the will, and often dined with him, and that their pictures were found in the rooms of his home.

Mrs. Ray Williams, a granddaughter, said that after her grandfather had a stroke of paralysis in 1903, "I noticed a twitching of his lips after the stroke, and he was quick to cry about things. I have seen him sob all alone in the room, and would be twirling his hands and would be chuckling to himself, and would cry when no one was around him or doing anything to hurt him, and no one was talking to him. I think it was in 1904 he had the second stroke. He seemed to be worse then than before, and I noticed that grandma cared for him very, very closely." This witness overheard a conversation, in 1904, between W. H. Boone, who was at the testator's home with his wife, in which the testator was praising his home property and asking his son how he thought it would do for a park. It was shown that he had also mentioned to many others that parks were good things for the people and ought to be provided by cities.

Most of the children testified that he was not competent to transact business after the second stroke of paralysis, and that, although he could do the little chores about the house, they did not regard him competent to attend to matters of any importance.

Two experts testified upon hypothetical questions submitted to them that the testator was not of sound and disposing mind and memory.

On the other hand, his banker, his groceryman, and the merchants with whom the testator did business, testified that he was a gardener and truck farmer, and others of his friends and neighbors testified that there was no drawn condition of his face nor twitching of the muscles noticeable, and that while he had grown old and was getting feeble, that his mind and memory were not materially impaired, if at all. His widow stated that she did not know of his ever having had a stroke of paralysis, and also a woman who had been his nurse in a time of sickness.

A. J. Mercer, one of the witnesses to the will, and cashier of the Peoples Savings Bank since 1902, stated he had known the testator from 1896 to his death, that he was a customer of the bank from 1902; that he had done some business for him as an abstracter before that time; that "he kept an account with our bank from 1902 and a little before that, until his death." The account was not very large. "I witnessed his will at his request. The will is undated, but judging from records in the bank it was signed on May 22, 1905. The other witness, Mr. Stevenson, who was at the time paying teller in the bank, said he talked to him about making the will. He was probably in the bank five or six times in regard to it. I wrote out the draft of the will myself. There was more than one draft of it made. He discussed with me how he wanted to distribute his property. He came in first and gave us a general idea of what he wanted. I think he was perfectly intelligent and rational at the time. He took a draft of the will which I had prepared and went off with it and afterward brought it back and talked over what changes he wanted made. My recollection is there was no material change. Afterward I copied it as he decided he wanted it, and as it is now. I considered him rational at the time from my dealings with him and from my conversation with him. I couldn't say now whether

he gave the name to me 'Joseph H.' and I wrote it 'Joseph E.' Boone. The first consideration was that he stated that his children had never done anything for him and they had been provided for most of them during their lifetime, and a hesitance in not signing the first will was that he was not sure of the names of his grandchildren. He afterward brought these corrected names. He gave me a list of them and seemed to want to take a list and see whether the names were correct. In the second paragraph where he mentions 'my nephew, Emanuel, son of Will H. Boone,' he might just have said he was a child of so and so; I expect I didn't hear any better than that. I didn't stop to think, I guess.''

R. E. Stevenson, the other witness to the will, stated that after it was executed he heard a great deal of talk about the testator. ''His son, Will Boone, came to me several times and asked me if I didn't think the old gentleman of unsound mind, or words to that effect. I told him that I didn't think so at the time he signed the will, and I don't think so yet. I told him that he appeared to be getting kind o' old, and I don't remember the exact words I used—I think a little bit senile—but I didn't say that I wouldn't have witnessed the will. The testator was back and forth probably a month discussing the making of his will, and it was all in typewritten form and ready for signature when I was called in to witness it.''

W. E. Lenon stated that he had known testator for about fifteen years and knew him while engaged in the abstract business. Saw him in their bank frequently from 1904 to 1906. He was a depositor. ''I never noticed any twitching in his face. He was an elderly gentleman, and a little feeble; but nothing more than ordinary for a man of that age. He drew checks on the bank. I knew his signature. His book shows last balance, $669.49, on October 6, 1907.'' His account was continued in the name of Mrs. Boone as executrix. ''A few months before he made his will he talked to me about making it. At that time I noticed nothing in his speech or conduct

to indicate that he was not a perfectly rational man and knew what he was doing. In all my conversations with him, I never noticed anything except that he was just an elderly gentleman, in feeble condition and yet very rational. I had that same opinion about his sanity when he talked to me about making the will. * * * I don't recollect whether he discussed with me about giving this land to the city of Little Rock or Argenta for a park.''

Mrs. Underwood knew the testator three or four years before his death, and assisted his wife in nursing. him when he was sick. She said: ''His ability to get around and walk and carry on the affairs of life were good. He was never sick during that time, to my knowledge, except a little cold or something of that kind. He attended to all his business, did not limp, there was nothing the matter with his arm. His face was not the least bit drawn and I never saw any twitching of the muscles; I saw him every day and sometimes two or three times a day for a year; lived just across the street from him for a year, two or three years before his death. I talked with him, visited back and forth; his speech was distinct and his conversation intelligent, very much so; he read the papers and kept posted on current events and was an intelligent conversationalist.''

J. G. Vogel, a merchant in Argenta for twenty-eight years, who bought vegetables and berries from the testator and sold him groceries until a short time before he died, said: ''He certainly was able to attend to his business in every respect, and to take care of his own interest at any and all times. The last time he was in my store was about thirty days before he died. He bought five gallons of oil and I started to pick up the can and take it out and he said, 'No, no; I can get into the buggy;' and he got into the buggy unassisted. There was nothing the matter with him that I could see in any shape, form or fashion; he was getting along in years naturally. I think he was better preserved mentally and physically than one out of a great many thousand men who reach the age of seventy-eight or seventy-nine. I could observe

nothing wrong with his mind or his conversation or his demeanor. Never noticed any twitching or drawing of his face. Sometimes he would come to my place of business every day, in the fall maybe two or three times a week. When he would come across the river he would stop in my store. I never knew any one that was more industrious and thrifty.''

Others who had known him long and traded with him never noticed that his face was drawn or that the muscles twitched, and regarded him at the time of his death a rational man of good sense.

C. J. Kramer stated he had been in the grocery business in Little Rock for thirty years, and was acquainted with the testator for about ten years and had business with him for five or six years, up to the time of his death. ''He seemed to always know what he was doing. He would leave the goods there, go on Fifth Street, come back and we would settle the price at whatever they gave him on Fifth Street. He seemed rational. I spent a good deal of time talking to him, but not about making his will. He was always sane with me so far as the transactions and discussions I had with him. I never heard there was anything the matter with him until I was summoned here as a witness at the first trial.''

The widow testified that testator had never had a stroke of paralysis; that he sometimes got overheated in the fields, came in warm and would sit down a while. He was never sick any time until his last illness. He took sick on August 5 and died on the 22d, 1906. Never talked to her about making his will. Neither side of his face was drawn and there was no twitching of the muscles of it. She knew both Will and Jim Faucette by sight, but neither of them had ever been in the house prior to Mr. Boone's death. She did not know Mr. Faucette until he called to see her when the trial was set for November.

J. P. Faucette, the present mayor of Argenta, stated he was not acquainted with testator during his lifetime, never had seen him that he knew of, nor had any con-

versation with him. Was never on his place during his lifetime; he had seen it frequently—knew where it was. He never gave a picture of his to any of the Boone family, and, if they had one, he knew nothing whatever of it.

W. C. Faucette stated that he was mayor of Argenta from April, 1904, until January, 1911; that he was not acquainted with the testator, never had any conversation with him about this will, nor any other subject, was never at his residence during his lifetime, and that there was no picture of his in his house. Didn't know anything about the will until he read it in the newspapers, that he never saw his own picture in the newspaper, although they had a good deal to say about him.

Charles Vestal testified he lived on the property adjoining the testator, his nearest neighbor, and knew him well. "I must have known him over thirty years. I thought he had a good mind and entirely sane. I never talked to him about giving any part of his property to the city."

The testator, shortly after his last marriage, had had some litigation with his children and heirs about some property they claimed had belonged to their mother. This litigation was compromised and the property divided.

(1-2) The jury found upon conflicting testimony in favor of the validity of the will, and there is ample evidence to sustain their verdict. The decided preponderance of the testimony of witnesses not interested in the result and acquainted intimately with the testator, shows that he was of sound and disposing mind at the time of the execution of the will, and there is no testimony whatever tending to show that there was any undue influence exerted by Charles Vestal and Sarah Boone, the Faucettes or any one else, in procuring the execution of the will. The testator was old and he gave valuable property that his children expected would come to them to the city nearest which it was located for a park to be named "Boone Park," and kept for the benefit of the public and in commemoration of the donor. His disposition to

benefit his fellow-man and to erect a monument to his own memory in passing through this life was stronger than his inclination to take care of and further provide for his own children, who had long been away from his home and established families of their own. He had a right to do this, if his capacity was sufficient in law. In *McCulloch* v. *Campbell,* 49 Ark. 367, the court said that old age, physical infirmities, and even partial eclipse of the mind would not prevent the testator from making a valid will, if he knew and understood what he was doing— if he could retain in his memory without prompting the extent and condition of his property and comprehend to whom he was giving it and be capable of appreciating the deserts and relations to him of others whom he excluded from participation in his estate. *Ouachita Baptist College* v. *Scott,* 64 Ark. 351; *Hall* v. *Perry,* 47 Am. St. 354, 28 A. & E. Enc. of Law, 74; *Leeper* v. *Taylor,* 47 Ala. 221.

It is apparent that the testator retained in his memory the condition and extent of his property without prompting from any one and without any suggestions as to the disposition thereof. He went to the cashier of his bank, with whom he had long dealt, and told him he desired to make a will and what disposition he expected to make of his property. He discussed it with him several times, and a rough draft of the will was then made, which he took away with him and kept for a time and then returned and suggested such further amendments and corrections as he wanted made. He knew he was giving the bulk of his estate to his wife and intended to do so, and doubtless preferred to perpetuate his name in the gift to the city of the home place for a park to be called "Boone Park," instead of to provide further for his children, all of whom were grown and had long since gone from his home and established homes of their own, and who had also sued him to prevent the disposition of certain property that they claimed belonged to them as heirs of their mother. His mind doubtless was not as good as in the days of his youth and vigorous manhood, but the most that could be gathered from the testimony rela-

tive to the impairment of his mind was here and there an instance of absent-mindedness, if the testimony of the contestants had been believed.

(3)   The fact that the testator omitted the ''n'' in his signature in writing his first name, Emanuel, on one of the sheets of the will, in no wise affects its validity, for there is no contention even that he did not intend to and that he did not sign the will. The whole testimony on that point shows that he intended to and did sign it.  40 Enc. 1107; Plates' Estate, 148 Pa. St. 55; *Sheehan* v. *Kearney,* 35 L. R. A. 103; *Word* v. *Whipps,* 28 S. W. 151.

(4)   Neither did the designation of his son's son in the will as his nephew instead of his grandson affect its validity, for he gave the names of both and showed that one was the son of the other, and the mistake was a clerical error easily apparent and the beneficiary was sufficiently designated.

(5-6-7)   It is earnestly contended also that the court erred in not instructing the jury that the will was void as to one of the contestants, a granddaughter, whose name was omitted therefrom, and also that it was the court's duty to instruct the jury that the city of Argenta, the nearest to the property devised for the park, was incapable of taking under the will under the laws of the State. There was no necessity for the court to submit to the jury the question of Lucy Russell's, a granddaughter whose name was not mentioned in the will, rights thereunder, since there was no contention made by any one that the will was not ineffectual as to her. The fact was in evidence to the jury, and contestant had whatever benefit might arise from it in the argument. The instruction to the jury would only have been confusing and would not have conduced to any clearer understanding of the issues involved. Contestants did not ask the court to instruct the jury that the city of Argenta could not under the law hold this property and maintain it as a park under the provisions of the will, and can not, therefore, complain of the court's failure to do so if such was the law. It could make no difference in the question of the testator's ca-

pacity and the validity of the will if the city was without power to take the benefit of the gift, which we do not decide, and make a park upon the lands devised for the purpose, for if it had had no such power and could not have held them, then they would have reverted to the heirs of the testator, these contestants, in any event, because of the failure of the devise to the city.

We do not consider the other objections urged of sufficient importance to discuss them at length, it being sufficient to say that the issues were submitted to the jury on proper instructions and we find no prejudicial error in the record. The judgment is affirmed.