## Puryear *v.* Puryear.

4-4240

Opinion delivered May 4, 1936.

*George D. Hester* and *Williamson & Williamson,* for appellants.

*R. W. Wilson,* for appellee.

BUTLER, J. The will of W. F. Puryear, deceased, was admitted to probate in common form and subsequently a contest was filed in the circuit court of Desha county by John Puryear, the appellee, resulting in a verdict against the validity of the will.

The attack on the will was based on the grounds that there was a lack of testamentary capacity on the part of the testator and that the will was the result of undue influence. On these propositions the contestant introduced ten witnesses and the contestee forty-six. When the testimony of the witnesses on the questions at issue is carefully examined and analyzed there appears to be no material conflict except in the opinions, based on observed facts, entertained by these witnesses.

There are a number of grounds for error assigned in the motion for a new trial and argued in briefs of counsel. Some relate to the declarations of law given to the jury by the court and others to the competency of evidence permitted to go to the jury, and one to the form of the question propounded to the witnesses for the contestant (appellee) which sought to elicit from these witnesses an opinion regarding the sufficient mental capacity of the testator to make a will. We find it unnecessary to consider any of the assignments of er-

ror except those relating to the sufficiency of the evidence on the questions of testamentary capacity and undue influence.

It is elementary that, subject to statutory restrictions, every person of sound mind and disposing memory has the untrammeled right to dispose of his property by will as he pleases, however capricious and unjust such disposition may appear to be. Sound mind and disposing memory constitutes testamentary capacity which is said to be the ability of the testator to retain in memory without prompting the extent and condition of the property to be disposed of, to comprehend to whom he is giving it, and to realize the deserts and relations to him of those whom he excludes from the will. *Taylor* v. *McClintock,* 87 Ark. 243, 112 S. W. 405. This definition presupposes a mental capacity sufficient to execute a will free from undue influence. *Tobin* v. *Jenkins,* 29 Ark. 151. With respect to the ability to know the extent and condition of the property to be disposed of and to whom it is being given, and to appreciate the deserts and relations to the testator of others against whom he discriminates or excludes from participation in his estate, it is unnecessary that he actually has this knowledge. It is sufficient if he has the mental capacity to understand the effect of his will as executed. ''Capacity to understand the effect of making one's will, and not actual understanding, is the test of mental capacity required of the testator.'' *Huffaker* v. *Beers,* 95 Ark. 158, 128 S. W. 1040; *Emerich* v. *Arendt,* 179 Ark. 186, 14 S. W. (2d) 547. In determining the question of the testator's testamentary capacity, great latitude is allowed in the introduction of testimony. This includes, ''The contents of the will, the manner in which it was written and executed, the nature and extent of the testator's estate, his family and connections, their condition and relative situation to him, the terms upon which he stood with them, the claims of particular individuals, the situation of the testator himself and the circumstances under which the will was made, * * *.'' *Tobin* v. *Jenkins, supra.*

Following the rule in *Tobin* v. *Jenkins,* last quoted, the court below permitted inquiry into all of the facts,

both remote and recent, which might be informative of the question involved. It would be impracticable to state the testimony in detail or to quote the material facts as related by the witnesses as to do so would unduly extend this opinion. We, however, attempt to give the substance of the material evidence, stating only such as is undisputed or most favorable to the appellee.

W. F. Puryear began a mercantile business in a small way gradually increasing it until he was possessed of a fortune, which, in the locality where he lived, might be termed considerable. He was generally regarded by all who knew him as a man of steadfast character having those qualities which made him successful in a business way and liked by those with whom he came in contact. At the beginning of his career he was a strong and vigorous man, but afflicted with an impediment in his speech so that when he became nervous or excited he would stutter. Between 1925 and 1927 or 1928, a heart disease developed which confined him to his bed for days or weeks, then he would recover somewhat and be able to get about with the exercise of care. Because of this disease, approximately ten years before his death on August 4, 1934, he turned the management of his mercantile business over to his two sons, Oscar, one of the appellants, and John, the appellee. The mother of his two sons, his first wife, died when they were small children, Oscar being two years old and John twelve months. These boys were reared by certain of their relatives and Mr. Puryear remained unmarried until August, 1927, when he married the appellant, Mrs. Emma T. Puryear. At that time, or shortly thereafter, Mr. Puryear's heart disease had developed and he would sit around the store, but did not transact any business. If a customer appeared, he would usually tell him to wait until one of the boys came. Oscar, the elder of his two sons, managed the business, while John was the outside man engaged in soliciting business. In 1930, there was a crop failure in southeast Arkansas because of a protracted and extraordinary drouth. Mr. Puryear had been unable to collect his accounts and, because of this and his poor health, he decided to sell his mercantile business and told his

son, Oscar, to find a purchaser. Shortly after this Oscar proposed to purchase the business himself and on March 11, 1931, Mr. Puryear sold it to him, the contract of sale being drawn by Mr. Adrian Williamson at his office in Monticello. The terms of the trade had been agreed upon and after the writing evidencing the same had been prepared and signed, Mr. Puryear executed the will which is the subject-matter of the present litigation. Some of the witnesses for the appellee stated that about this time Mr. Puryear's physical condition was bad and that "there was right smart change" in his mental condition. One witness testified that Mr. Puryear stated that he was no longer able to attend to business and that his mind "was bothering him." Several witnesses stated that Mr. Puryear told them he didn't feel able to attend to business. John Puryear testified as to Mr. Puryear's mental condition that his father had told him that he was very forgetful. When asked, "What was the mental condition of W. F. Puryear along in the fall of 1930 and 1931," he answered, "Well, his mental condition was, so far as his health would let it go, I think it was all right." With regard to the extent of W. F. Puryear's estate, the evidence was to the effect that, aside from the mercantile business, he owned a quantity of town property in Dumas and ........................... Some of this was rental property. He also owned the brick store in which the mercantile business was conducted and the home in which he and Mrs. Puryear lived. The aggregate value of his holdings, aside from the mercantile business which he had sold to Oscar Puryear, was inventoried at $..................... which seems to be conceded as being approximately correct.

Based upon these facts, each of the witnesses for the appellee was propounded the following question (being the same as that propounded to John Puryear): "Q. Now, from your observation of him, your associations with him during the latter part of 1930 and the first part of 1931, his expressions and so on, knowing as you do the nature and extent of his property, and keeping in mind that the law says that in order to make a will a person must have sufficient mental capacity to keep in mind

without prompting from any one the nature and extent of his property, the relations of his family and their just deserts as the natural objects of his bounty, with those matters, tell the jury whether or not, in your opinion, your father, W. F. Puryear, had sufficient mental capacity on the 11th day of March to make a will?'' Some of these witnesses, and also John Puryear, answered in the negative—that is to say, it was their opinion that the testator did not have sufficient mental capacity on the above date to make a will. After answering the above question, John Puryear stated that his opinion was based on the health of his father and the fact that the sale of the merchandise was improvident in that $36,000 worth of merchandise, as he estimated it, was sold for $5,000, payable at $500 a year.

Dr. H. A. Dishongh was present during the recital by the witnesses of the facts above stated and also heard the statement of one witness to the effect that a physician, then dead, had told him (the witness) that W. F. Puryear had arterio sclerosis and high blood pressure. This testimony was objected to as hearsay, but was admitted over the objection of the appellant. Dr. Dishongh was asked if he had heard all the above facts narrated and, if so, did W. F. Puryear, in his opinion, have ''sufficient mental capacity to make a will without prompting,'' basing his opinion upon the facts narrated and his experience with arterio sclerotic patients. The doctor answered, ''I don't think he had.''

It is clear that with the opinions of the lay witnesses and of the learned doctor excluded, there is a total lack of testimony tending to establish any mental defects or abnormalities, much less a weakened mental condition of sufficient degree to render the testator incapable of executing a will under the rule heretofore announced. The most that can be said is that the testator was between 68 and 69 years old at the time he executed the will and that he gave to his widow and eldest son a greater part of his estate than he willed to his younger son, John Puryear, the appellee. To be exact, by the terms of the will there was conveyed to Mrs. Puryear the home in which she resided, the $5,000 worth of notes

of Oscar Puryear's and two-fifths of the remainder of the estate. Oscar Puryear was given two-fifths of such remainder and one-fifth was devised to John Puryear. Further, it may be said, that for some years previous to the execution of the will the testator had been a sick man and at that time he realized that he was incapable of successfully managing his mercantile business, and according to his own statements, he was forgetful and his mind bothered him.

The evidence relating to the execution of the will is undisputed and is to the following effect: On the morning of March 11, 1931, W. F. Puryear and his son, Oscar, prepared to go to Monticello to consummate the sale of the mercantile business. They invited Mrs. Emma T. Puryear to accompany them. At that time she did not know the purpose of the contemplated journey and went with them to Monticello. When the terms of the sale were stated to Mr. Adrian Williamson and after the business in that connection had been finished, W. F. Puryear announced that he had concluded to make his will, and Mrs. Puryear and Oscar left the room where he was, either at his request or on their own volition. At any rate, they were not present when the will was drafted or during the conversation had between Mr. Puryear and his attorney preliminary thereto. Mr. Puryear informed the attorney how he wished the will written and told him about his property, real and personal, giving the legal description of his homestead and some of his real property in Dumas. He told the attorney his reason for making the will and was present when the attorney dictated the will to the stenographer. It was not until the will was completed that Oscar and Mrs. Puryear returned to the room. The will was carried by Mr. Puryear to the bank at Dumas and it remained there until his death, when it was opened. Neither Oscar Puryear nor Mrs. Emma T. Puryear knew its contents until that time.

Counsel for appellee reaches the conclusion that the testator and his wife and son discussed the will on their return journey from Monticello to Dumas. He bases this upon part of the testimony of Oscar Puryear relat-

ing to what occurred on this journey who stated that his father said: "You know I am bothered with heart trouble. I don't want to unload the job on you, but it's going to be up to you to do it. You know I can't do it. I can't go down and tell John. It's going to be up to you and I want you to get witnesses in there when you go to tell him." When this statement is considered in connection with the other evidence, it is clear that it relates to the purchase by Oscar of the mercantile business. John Puryear had been working in the business, drawing an equal salary with his brother, and was so at the time the sale was consummated. The father had reasons to believe that Oscar was dissatisfied with John's conduct with regard to the business and that the sale to Oscar would terminate John's connection with it. This was the reason Mr. Puryear desired that Oscar would be the one to tell John about the change of ownership.

If there was other evidence tending to establish an impairment of the mind of the testator, the manner of the disposition of his property would be admissible to be considered with such other evidence. But there is none such. Even if there was some testimony tending to show feebleness of intellect, it would not of itself be sufficient to establish lack of testamentary capacity unless it was so great as to render the testator incapable of appreciating the nature and consequences of his act. *Phillips* v. *Jones*, 179 Ark. 877, 18 S. W. (2d) 852. Neither would physical suffering on the part of the testator be sufficient to render the will void unless it was so great as to make him incapable of properly disposing of his estate. *Griffin* v. *Union Trust Co.*, 166 Ark. 347, 266 S. W. 289.

There remains to be considered the opinions of the expert and nonexpert witnesses as to the testator's testamentary capacity. For the purpose of this discussion, we overlook the objections to the questions as propounded and treat them as properly phrased. These opinions can rise no higher than the facts upon which they are based. The facts testified to by the witnesses bear no just relation to the opinion expressed by them, and the court should have sustained appellants' objections to

their expression. That of the expert was based on the identical facts upon which the other witnesses grounded their's, and is, therefore, of no higher dignity or any more competent than the opinion of any other witness. "If the witnesses testify that testator is insane, but give as a basis for such opinion facts which do not justify it, their evidence on this point is worthless, and cannot support a verdict in favor of contestants." Page on Wills, vol. 1, 2d ed., § 698, p. 1173. "Witness will not be permitted to state an opinion inconsistent with, or finding no support in, the facts stated by him." 22 C. J., chapter on Evidence, § 652. "* * * the opinion of such a witness is not admissible in evidence until it be first shown by his own testimony that he has information upon which it can reasonably be based. Whether the information is sufficient for that purpose is a question for the court to decide before it can be admitted." *Schaeffer* v. *State*, 61 Ark. 241, 32 S. W. 679.

There remains to be considered the question of undue influence. In *Lavenue* v. *Lewis*, 185 Ark. 159, 42 S. W. (2d) 649, the testator was about ninety years of age. On the contest of the will, the undue influence of the wife was charged as the procuring cause of its execution. In that case we stated the rule relating to the sufficiency of undue influence to avoid a will as follows: "As we understand the rule, the fraud and undue influence which is required to avoid a will must be directly connected with its execution. The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion, or any other cause deprives the testator of his free agency in the disposition of his property. And the influence must be specifically directed toward the object of procuring a will in favor of particular parties. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relation with them at the time of its execution. (Quoting from 3 Elliott on Evidence, § 2696): 'The influence of the husband over the wife, that of the wife over the husband, of the parents over

the children, and of the children over the parents, are legitimate, so long as they do not extend to positive dictation and control over the mind of the testator.' "

. ' We are of the opinion that the evidence fails to satisfy the rule stated. As to the influence Oscar Puryear exerted over his father, the evidence is wholly silent except that Oscar Puryear was a man of firm character, wanting to take the lead and be the head of all the undertakings in which he engaged and that his judgment dominated with respect to the conduct of the mercantile establishment. There is no evidence that he ever suggested to his father that he make his will, or that he knew what disposition had been made of the property until after his father had died. It is argued that the terms of the purchase and sale of the mercantile business were sufficient to show an exercise of undue influence by Oscar Puryear over the mind of his father. To this we cannot agree. It is true that John Puryear and a man who had clerked in the store testified that the invoice value of the mercantile establishment was from thirty-five to forty thousand dollars, including accounts and bills payable. This was not sufficient, however, to show the real value of the assets. The value, as shown by the invoices, might have been far greater than the then market value of the goods and we are not advised of the total face value of the accounts and bills receivable. These might have been far less in real worth than face value and many might have had no value at all, and at the time Oscar Puryear purchased the business, in addition to the $5,000 to be paid W. F. Puryear, he assumed debts due by the business amounting to five or six thousand dollars.

Witnesses testified, and no doubt this testimony is true, that W. F. Puryear held his two sons in equal affection. During the continuance of the ownership of the mercantile business by W. F. Puryear, Oscar and John were paid equal salaries. Just before Mr. Puryear married the second time, he conveyed to each of his sons a residence in the town of Dumas. For a time before his marriage he resided at the home of John. After this, for a brief time, he lived with Oscar while building a

home of his own. We think he loved them with the same degree of affection, but it by no means follows that he had equal confidence in their business ability or their respective necessities. Oscar had begun to work for his father in the store when he was 15 years old and continued in his employment until he was called to the army in 1917. Then it was that John came and Oscar taught him enough about the business to enable him to carry on until Oscar's return about eighteen months later. While some of the witnesses testified in effect that of the two John was the more valuable to the business, there is no indication that the father so believed, and while to one not acquainted with all the facts the difference made between the two sons by W. F. Puryear in his will may appear unjust and capricious, there is a want of evidence to show that this discrimination was brought about by the undue influence of Oscar Puryear, especially when it is considered that Oscar's stepmother was favored beyond him in a substantial degree.

Able counsel strongly insist that the maligning influence of Mrs. Puryear resulted in the execution of the will. We think this contention unjustified by the undisputed evidence. At the time of the marriage or shortly thereafter, W. F. Puryear was afflicted with a disease which rendered his life tenure doubtful which could be prolonged only by the exercise of the greatest care. From the first Mrs. Puryear undertook the care of her sick husband and the fact that she drove him in an automobile everywhere he went and was reluctant to have him go any distance without her seems to us to comport with the duty and affection that a faithful wife would be expected to show. There is not the slightest indication that she influenced, or attempted to influence, him with respect to the management of his property or the disposition of his estate. He had various properties other than the mercantile business which he continued to manage, both before and after the sale of the mercantile business. Mrs. Puryear accompanied him in his visits to these properties. When John Puryear, on the day following the sale, learned that the business had been acquired by his brother he went to his father to talk to

him about it. On this first visit Mrs. Puryear did not interfere with the conversation. The father was distressed and told John of the reasons for the sale and finally said he had made a fool of himself. On John's second visit to his father, Mrs. Puryear interfered and told John that he must not talk to his father any more about the business because it worried him so. It was further in testimony that after Mr. Puryear married he did not associate with his old friends with his former frequency and would seldom come to town without Mrs. Puryear. All of this fails to satisfy our minds of any ill influence exerted, and forces the conclusion that Mrs. Puryear's conduct throughout her married life was both innocent and proper.

In discussing the facts in evidence, we have failed to relate the fact that after the sale of the business to Oscar Puryear, W. F. Puryear was greatly disturbed and was sick for two or three weeks. There may be other facts which we have failed to notice here, but we have carefully examined the record and have reached the conclusion that, while it may appear that John Puryear was unjustly treated by his father in the execution of the will, it was the free act of the testator at a time when he had the mental capacity to fully understand the nature and consequences of his act, and that the trial judge should have directed a verdict for the proponents (appellants here) on both issues.

Considering the duration of the trial, which appears to have continued for the better part of a week, and from the record before us, it is our opinion that the case has been fully developed. The judgment will therefore be reversed, and the cause dismissed.

HUMPHREYS and MEHAFFY, JJ., dissent.