BOYLAND v. BOYLAND.

4-8168                                    203 S. W. 2d 193

Opinion delivered June 23, 1947.

*Harrelson, Harrelson & Cannon,* for appellant.

*Norton & Norton,* for appellee.

HOLT, J. Appellants sought to probate a written instrument, alleged to be the last will of Dr. J. F. Boyland, who died April 24, 1944. Appellees contested its probation on the ground that its execution had been procured by the undue influence of appellant, Bessie May Sanders, one of the beneficiaries, who claimed to be the

widow of the testator, and on the additional, and principal, ground that the testator lacked testamentary capacity. The parties here are Negroes.

Some evidence was offered by appellees to support the allegation of undue influence in procuring the execution of the will, but the greater part of the testimony was offered to show a lack of testamentary capacity.

Upon a consideration of all the evidence, the trial court found "that the paper writing filed in this Court. on May 1, 1944, and purporting to be the last will and testament of Dr. J. F. Boyland, deceased, is void and not entitled to be probated," and from the decree comes this appeal.

While the decree does not specifically so recite, it appears from the briefs of counsel to be admitted that the primary ground on which the will was declared void by the court was because of the testamentary incapacity of the testator at the time it was alleged to have been executed.

Appellants say that there are three questions presented, which are: "1. Was the will duly executed in accordance with the statute? 2. Was the will, or paragraph six thereof, procured by undue influence? 3. Did the Testator at the time of the execution of the will (if it was duly executed) have the necessary testamentary capacity?"

The cause comes to us for trial *de novo*.

The conclusion we have reached in this case makes it necessary to consider only appellants' third question, *supra*, that is whether the testator lacked testamentary capacity.

Dr. Boyland had been married three times before he attempted, at the approximate age of 74, to marry appellant, Bessie May Sanders, in November, 1942. His first wife died in 1899, the second divorced him in 1908, and the third, appellee, Mary L. Boyland, whom he married in 1912, and who lives in Ellendale, Tenn., is his

present lawful widow, they never having been divorced. Bessie May Sanders was at the time of her alleged marriage to Dr. Boyland thirty-six years of age, and had, but a short time before, secured a divorce (for which Dr. Boyland furnished the money) and had deserted her three children,—the oldest being six years of age, and the youngest, "just a baby",—in order to become, in effect, Dr. Boyland's mistress.

In June, 1943, Dr. Boyland prepared a typewritten instrument in the form of a will, which he signed some time between this date and April 4th or 5th, 1944. Appellants alleged that he completed its execution by having Rev. W. L. Purifoy and W. L. Purifoy, Jr., sign the instrument, as attesting witnesses, in his presence, at his home on April 4th or 5th, 1944, and it is this alleged will that is in question here.

Much of the testimony on the testamentary capacity of the testator is in irreconcilable conflict, and it would serve no purpose to set it out in detail.

In addition to the testimony of the interested contestants (appellees) some eight or nine other and disinterested witnesses testified in effect that Dr. Boyland lacked testamentary capacity for some time prior to March 18, 1944, when he was admitted to Mercy Hospital in Forrest City, until his death on April 24th, a little more than a month later. It appears to be undisputed that Dr. Boyland, for some time prior to his admission to the hospital in Forrest City, was suffering from cancer which continued to grow worse and was the principal, if not the direct cause of his death April 24, 1944.

Among the above disinterested witnesses were Dr. Roy, who owned and operated Mercy Hospital and who treated Dr. Boyland in his hospital from March 18th to March 30th, and his chief nurse who had Dr. Boyland in charge and saw him four or five times daily, both of whom testified that in their opinion Dr. Boyland lacked testamentary capacity during the time he spent in Mercy Hospital, and thereafter until his death, April 24th. They

testified that he grew worse from day to day after his admission to the hospital.

Dr. Roy further testified that he was insane, would have to be committed to an institution, that his physical condition was deteriorating very rapidly and that he did not possess recuperative power to improve to the point where he would be capable of executing a will or transacting other business, and that when he came to the hospital he had been taking drugs to alleviate his constant pain and suffering to the extent of a fourth of a grain of morphine, but after "being admitted to the hospital it would not relieve him and therefore it was necessary to increase it to a half grain * * * every two or three hours."

Dr. Roy had a degree from the medical college of the University of Tennessee and interned in St. Joseph's Hospital in Memphis following which he had been in practice for more than two and one-half years and operating a clinic and his own Mercy Hospital in Forrest City.

Of the above disinterested witnesses who testified in effect that Dr. Boyland was mentally incompetent, Delilah LaFlore, after Dr. Boyland was moved to his home on March 30th, went to his home "from three to four times a week," and would go "at night about 8, and stay until 11, 12 or 1 o'clock;" another, Benjamin Hadley, assistant pastor of Dr. Boyland's church, visited him "two or three times a week" during this period; a neighbor who lived across the street "was over there every day" and "stayed there several nights for company with the family," and the first day that he was home from Mercy Hospital, she tried to talk to him, but "he talked so random, I didn't bother him any more. He didn't know what he was talking about; said somebody was trying to kill him or rob him, random talk like that; Henry Porter was there "about every other day;" Horace Davis who lived next door "hardly missed a day" seeing Dr. Boyland; witness, L. B. Wilson, lived in the same house with Dr. Boyland, Horace Davis next door,

and Mattie Neely just across the street, and these witnesses, from related acts that continuously occurred, thought Dr. Boyland insane when the will was attested on April 4th or 5th, and most of them that he was insane at all times after he came home from Mercy Hospital on March 30th until his death, April 24th.

As against the above testimony of appellees, appellants rely primarily upon the testimony of appellant, Bessie May Sanders, the two attesting witnesses, W. L. Purifoy and his son, W. L. Purifoy, Jr., Dr. Banks and Rev. I. L. Pitts and his wife, all of whom testified, in effect, that in their opinion Dr. Boyland possessed testamentary capacity on April 4th and 5th, and for some time prior thereto.

With reference to the testimony of Bessie May Sanders, in the circumstances here, we think it deserves, and we give to it, no credit.

In considering the force to be given the testimony of Rev. Purifoy, Sr., we think it noteworthy that while Dr. Boyland and Bessie May Sanders were admittedly both members of his church, the effect of his testimony was that he knew they were living together, though unmarried, and in effect, approved rather than condemned their reprehensible conduct.

His son testified positively that the will, which he and his father attested as witnesses on April 4th or 5th, was in the handwriting of the testator, Dr. Boyland, or was holographic, when in fact the will in question was typewritten.

According to the testimony of Rev. I. L. Pitts, he visited Dr. Boyland, once at Mercy Hospital, four or five days before he was taken home on March 30th, and again on April 9th in company with eight or nine members of his church, he went to the testator's home for a prayer service. His wife saw him only once, which was at this service. They both testified that he talked normally and seemed to be in his right mind. The other eight or

nine members who were at the service appear not to have testified in this case.

Dr. Banks testified that he graduated from Meharry College, Nashville, Tenn., in 1910, and had been a practicing physician in Forrest City since June, 1915; that he visited Dr. Boyland five times while he was in Mercy Hospital, but not as his physician, and after he returned to his home, he made five more visits, in a professional capacity, April 13, 14, 16, 21 and 24. He always found him "in pain" but able to carry on an intelligent conversation and on all of these visits until about the 16th of April, he considered Dr. Boyland mentally capable of transacting business and making a will.

This is one of those cases wherein the trial court was in a much better position to weigh and consider the testimony, than we could possibly be. Our conclusion, after consideration of all the competent testimony, is that the finding of the chancellor is not against the preponderance thereof and the decree is therefore affirmed.