WALSH *v.* FAIRHEAD, EXECUTRIX.

4-8804                                                        219 S. W. 2d 941

Opinion delivered May 2, 1949.

*Frank C. Douglas, Clair McTurnan* and *Alembert W. Brayton, III,* for appellant.

*Sloan & Sloan,* for appellee.

MINOR W. MILLWEE, Justice. This is a contest of the last will of Maurice P. Welsh who was a resident of Jonesboro, Arkansas, for 45 years prior to his death October 4, 1946. Decedent was survived by a daughter, Elizabeth Welsh Knollton of Phoenix, Arizona, and the following nieces and nephews: Margaret Welsh Fairhead of Jonesboro and William Welsh of Indianapolis, Indiana, children of decedent's brother, Michael Welsh; Ann Walsh, Lillian Walsh and Julia Walsh McNutt of Kokomo, Indiana, daughters of decedent's brother, Patrick Walsh; Thomas Kane of San Francisco, California, son of decedent's sister, Nellie Welsh Kane. Margaret Walsh Fairhead has a son, Maurice J. Fairhead who is a grandnephew of decedent and also a resident of Jonesboro. All of decedent's brothers and sisters predeceased him.

The will in question was executed on August 22, 1946, and admitted to probate in common form on October 9, 1946. Appellants, Ann Walsh and William Welsh, filed this action in the probate court against appellee, Margaret Welsh Fairhead as executrix and trustee under the will. The contest is based on allegations of mental incapacity of the testator and undue

influence exercised by "persons who would benefit directly or indirectly" by the alleged will. Appellants also alleged that in 1937 decedent contracted with Patrick Walsh to make testamentary bequests aggregating $10,000 to the latter's three daughters.

Appellee moved to dismiss the petition of appellants asserting that if the 1946 will was held invalid, the estate would go to decedent's daughter and appellants were, therefore, without interest. In response to this motion appellants filed an amendment to their petition alleging that a will, executed by decedent on January 4, 1944, under which appellants would inherit, was the true will and should be produced by said executrix. The response of the executrix denied the allegations of the petition and exhibited an attorney's office copy of the 1944 will.

After an extensive hearing, the probate court found: "That the testator, Maurice P. Welsh, had sufficient mental capacity on August 22, 1946, to make a valid will; that the will being contested was executed on said date; that the evidence does not indicate that there was any fraud or undue influence on the part of anyone in connection with the execution of said will, and petition of petitioners should be dismissed with costs."

Maurice P. Welsh was a native of Indiana. He came to Jonesboro about 1900 and engaged in the operation of a handle factory. He and his wife were separated and their daughter Elizabeth made her home with her mother in Kentucky and Arizona, but frequently spent her vacations with her father at Jonesboro. Decedent lived at a hotel at Jonesboro until 1925 when he built a home. At his request appellee, Margaret Welsh Fairhead, who was divorced, moved with her fifteen year old son from Indiana to Jonesboro to take care of the new home. Mrs. Fairhead was housekeeper for her uncle until his death. Maurice J. Fairhead, her son, also resided in the home and decedent provided liberally for his support and education.

Decedent was a man of superior business ability and had acquired an estate valued at approximately

$180,000 at the time of his death at the age of 76. In 1937, he conveyed the home to Mrs. Fairhead. He also gave her savings bonds of several thousand dollars over a period of years and conveyed certain real estate to her shortly before the execution of the 1946 will. After he moved to Jonesboro, decedent made annual visits to Indiana and his Indiana relatives occasionally visited him at Jonesboro. The expenses of these visits were paid by decedent who also assisted his relatives in medical and other expenses.

The will of August 22, 1946, provided for special bequests as follows: $10,000 to Convent Maria Stein and St. Bernard's Hospital of Jonesboro; $5,000 to Jonesboro Public Library; $100 each to Thomas Kane and the three daughters of Patrick Walsh, deceased; and all decedent's interest in the American Handle Company to his grandnephew, Maurice J. Fairhead. The residue of the estate was placed in trust with decedent's niece, Margaret Fairhead, as trustee at a salary of $150 a month; and the annual net income of said trust was divided three-fourths to appellee, Margaret Fairhead and one-fourth to decedent's daughter, Elizabeth, with certain limitations and exceptions as to the daughter's share. The corpus of the trust estate after the death of the two beneficiaries was given to Convent Maria Stein and St. Bernard's Hospital, unless decedent's daughter left bodily heirs, in which event one-fourth of said corpus passed to such heirs.

The will of January 7, 1944, contained special bequests as follows: "St. Bernard's Hospital, $1,000; William Welsh, $1,000; Thomas Kane, $500. The balance of the estate was given five-eights in fee to appellee, Margaret Fairhead; one-eighth to the three daughters of Patrick Walsh, deceased, and the remainder in trust for the benefit of decedent's daughter, Elizabeth. Both wills contained an *in terrorem* clause which nullified any gift to a beneficiary who contested the will.

Decedent became afflicted with prostatic cancer about 1938 and underwent several operations from 1938

to 1943. Although his condition grew slowly worse, he remained active in the operation of his various enterprises until a few weeks prior to his death in October, 1946. He was hospitalized at different times for the treatment of his affliction and was in the Jonesboro hospital on August 22, 1946, when he executed the will in question. He was discharged from the hospital the last time on August 24, 1946.

In attempting to meet the burden of showing mental incapacity and undue influence appellants offered the testimony of themselves, Lillian Walsh, Margaret Fairhead and Dr. Charles W. Miller, Jr., a psychiatrist. Appellee offered the testimony of decedent's family physician, minister, the attorney for the handle factory, and two of the three witnesses who attested both wills and also a will executed by decedent in 1935. Appellee also offered the evidence of several friends and business associates of decedent.

Appellant, William Welsh, visited his uncle for two weeks in the first part of July, 1946. He stated that he and decedent went on walks and had several conversations during the visit; that decedent would start a conversation while they were in the yard and become seized with pain, go into the house and upon his return, would talk about a different subject. He thought decedent's occasional inability to connect statements was attributable to pain and failing memory. Witness stated that he would sometimes get "half-crocked" when they drank together and forget what decedent told him. He also admitted that decedent's mind was clear when he arranged for the purchase of a set of false teeth and suit for witness and also gave him some cash on this visit.

Appellant, Ann Walsh, testified that she visited decedent from August 28 to September 10, 1946; that decedent was nervous and suffered much pain, but slept most of the time and did not talk much; that she brought a toy playing piano which played a familiar Irish tune which he failed to recognize. She also testified that Maurice J. Fairhead went into decedent's room on one

occasion, lay across the bed and pleaded with decedent about some promise that he had made, and that a few days later the secretary of the handle company and Maurice Fairhead went into decedent's room when presumably decedent transferred a part of the stock of the handle company to Maurice. She also stated that her father used the name "Walsh" because it was more Irish than "Welsh."

Lillian Walsh testified about an alleged dispute between her father, Patrick Walsh, and decedent growing out of the settlement of the estate of their mother who died in Indiana in 1916. She only knew what her father had told her about the dispute. She stated that she visited decedent with her father in 1937 and heard a conversation between her father and decedent in which the latter persuaded the former to undergo an eye operation at Memphis, Tennessee, at decedent's expense; that her father refused to have the operation performed unless decedent also agreed to pay or make a testamentary bequest of $10,000 to Patrick's three daughters in satisfaction of the 1916 dispute; and that the operation was performed after decedent agreed to do so. Decedent had made two loans of $500 each to witness which had not been repaid.

Dr. Charles Miller, Jr., the psychiatrist, explained in detail the hospital records of the decedent. In answer to hypothetical questions based primarily on said records, it was his opinion that decedent was suffering from delirium and did not have the mental capacity to make a will on August 22, 1946. Witness had never seen decedent and did not usually diagnose cases from hospital records only. He admitted that such diagnosis is less satisfactory than actual acquaintance with and observation of the patient.

The evidence on behalf of appellee tended to show that decedent was mentally capable of making the 1946 will and that there was no undue influence exercised upon him. Dr. W. H. Willet, decedent's family physician for 33 years testified that he saw decedent almost daily during the last six months of his life and that

his mind did not become affected until 24 to 48 hours before his death. He stated that decedent's ability to transact business was "very good" on August 22, 1946; that decedent subsequently told him of the charitable bequests he had made in the will, and that his mind was exceptionally clear at that time.

The testimony on behalf of appellee also shows that early in 1946 decedent told his attorney and business associate, who had drafted the 1935 and 1944 wills, that he wanted to change his will; that decedent in June and July, 1946, took an active part in several conferences involving negotiations of a union contract growing out of a labor dispute at the handle factory; that late in July, 1946, his attorney furnished decedent with an office copy of the 1944 will upon which decedent made pencil notations of the changes he desired to make. After this was done the attorney redrafted the will and took it to the hospital where it was read to and approved by decedent on August 21, 1946. At decedent's direction, the attorney returned to the hospital about 8:00 a. m., August 22, 1946, with the three witnesses who had witnessed the former wills, and the will in question was duly executed. The witnesses to the will stated that decedent's mind was clear and that he apologized for inconveniencing them with his affairs. There was no one present except decedent, his attorney and the witnesses. Several other friends and business associates of long standing, including decedent's boyhood friend from Indiana, testified to the mental soundness of the decedent both immediately prior to and after the date of the execution of the 1946 will.

The evidence further discloses that early in 1946 decedent transferred a part of his stock in the handle company to his grandnephew, Maurice J. Fairhead, and made him manager of the factory and that decedent continued to give advice and exercise general supervision over operation of the plant until shortly before his death. It was also shown that decedent and his niece, Margaret Fairhead, were devout members of the Catholic Church while Patrick Walsh had withdrawn there-

from and his daughters were not members of that church.

. The recent case of Shippen v. Shippen, 213 Ark. 517, 211 S. W. 2d 433, involved facts somewhat similar to those in the instant case. We there said: "We have often defined mental capacity such as must be possessed by a testator in order for him to make a valid will. The rule has been generally expressed that sound mind and disposing memory, constituting testamentary capacity, is (a) the ability on the part of the testator to retain in memory without prompting the extent and condition of property to be disposed of; (b) to comprehend to whom he is giving it; and (c) to realize the deserts and relations to him of those whom he excludes from his will. Taylor v. McClintock, 87 Ark. 243, 112 S. W. 405; Boone v. Boone, 114 Ark. 69, 169 S. W. 779; Mason v. Bowen, 122 Ark. 407, 183 S. W. 973, Ann. Cas. 1917D, 713; Griffin v. Union Trust Company, 166 Ark. 347, 266 S. W. 289; Puryear v. Puryear, 192 Ark. 692, 94 S. W. 2d 695; Petree v. Petree, 211 Ark. 654, 201 S. W. 2d 1009. And the burden of proof, in cases of this kind, is on the contestant, who asserts the mental incapacity of the testator. McWilliams v. Neill, 202 Ark. 1087, 155 S. W. 2d 344; Parette v. Ivey, 209 Ark. 364, 190 S. W. 2d 441. . .

"Considering the question of undue influence such as invalidates a will, we said in the case of McCulloch v. Campbell, 49 Ark. 367, 5 S. W. 590: 'The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion, or any other cause that deprives the testator of his free agency in the disposition of his property.' "

In the famous case of Taylor v. McClintock, supra, it was held (Headnote 4): "Testators are not required to mete out equal and exact justice to all expectant relations, and the motives of partiality, affection or resentment by which they may be influenced are not reviewable; and if one have the capacity to make a will, he may

make it as eccentric, injudicious and unjust as caprice, frivolity or revenge can dictate."

We also adhere to the rule that the questions of testamentary capacity and undue influence are so interwoven in any case where raised that such questions should be considered together. As the court said in Phillips v. Jones, 179 Ark. 877, 18 S. W. 2d 352: "Where the mind of the testator is strong and alert the facts constituting the undue influence would be required to be far stronger in their tendency to influence the mind unduly than in another, where the mind of the testator was impaired, either by some inherent defect or by the consequences of disease or advancing age. It is clear that feeble intellect will not be of itself sufficient to establish lack of testamentary capacity, for that condition must be so great as to render the testator incapable of appreciating the nature and consequences of his act; but this feebleness may be inferred when, from the facts in proof, it is apparent that he was incapable of appreciating the deserts and relations of those whom he excludes from participating in his estate, although he might have had the ability to retain in memory, without prompting, the extent and condition of his property, and to comprehend to whom he was giving it." See, also, Brown v. Emerson, 205 Ark. 735, 170 S. W. 2d 1019.

Appellants rely very strongly on the Phillips and Brown cases, supra, and also on Boyland v. Boyland, 211 Ark. 925, 203 S. W. 2d 192. It would unduly extend this opinion to recite the difference between the facts of these cases and those in the instant case as pointed out in appellee's brief. This is another case where the trial court, who heard and observed the witnesses testify, is in a much more advantageous position than this court in evaluating evidence. When we apply our well established rules to the evidence here adduced, we conclude that the trial court correctly held that appellants did not discharge the burden resting upon them of showing by a preponderance of the evidence either mental incapacity or undue influence which the law requires before a solemn will may be declared a nullity.

The trial court sustained appellee's objection to the opinion of appellants to the effect that decedent was mentally incapable to make the will in question. We have frequently held that a non-expert witness may testify as to his opinion after stating the facts upon which the opinion is based so that the court may determine the weight to be given such testimony. In Griffin v. Union Trust Company, 166 Ark. 347, 266 S. W. 289, the rule was restated as announced in the early case of Kelly's Heirs v. McGuire, 15 Ark. 555, where the court said: "The value and force of the opinion depends on the general intelligence of the witness, the grounds on which it is based, the opportunities he had for accurate and full observation, and his entire freedom from interest and bias." If such opinion rests upon facts which do not justify it, then it is worthless. Puryear v. Puryear, supra.

We agree that the trial court erred in refusing to permit appellants to state their opinion that the testator was mentally incompetent, but it does not necessarily follow that the cause should for that reason be reversed. We try the case here *de novo* and will only consider the competent testimony regardless of the ruling of the trial court on the challenged evidence. Harrell v. Southwest Mortgage Co., 180 Ark. 620, 22 S. W. 2d 167; Brittian, Adm. v. McKim, 204 Ark. 647, 164 S. W. 435. The same ruling is applicable to the trial court's admission in evidence of a letter from decedent's daughter, Elizabeth, to Ann Walsh admitted upon the latter's cross-examination. The letter had no bearing upon the issues involved and we disregard it entirely in passing on the weight of the evidence. Although we have considered, here, the excluded opinion evidence and have disregarded the contents of the letter, we hold that the judgment of the probate court was, nevertheless, correct.

Appellants also invoke the following rule stated in Smith v. Wheat, 183 Ark. 169, 35 S. W. 2d 335: "Where parties have it in their power to explain suspicious circumstances connected with a transaction, the court trying the case may regard the failure to do so as a proper subject for comment and may regard their fail-

ure to produce evidence within their power as a circumstance against them." The case cited involved a fraudulent conveyance by an embarrassed debtor to a near relative under very suspicious circumstances. Appellants argue that they are non-residents while appellee and other beneficiaries under the will were in Jonesboro, which made it difficult, if not impossible, for appellants to obtain the testimony of local physicians and lay witnesses. Appellants also point out certain inconsistencies in the testimony of witnesses for appellee which they assert could have been cleared up by a more thorough examination of said witnesses or the calling of others by appellee. As previously stated, the burden in the instant case was upon appellants to prove the invalidity of the will. If there were physicians and other witnesses in Jonesboro who were conversant with the facts, they have not been identified by appellants. Nor has it been shown that any such witnesses were less available to appellants than to appellee. Moreover, we do not agree with appellants' contention that the circumstances in the instant case are such as to call for application of the rule relied upon.

The judgment of the probate court is supported by the preponderance of the competent evidence and is, therefore, affirmed.