PERNOT *v.* KING.

4-4777

Opinion delivered November 1, 1937.

*Pigford & Key* and *R. S. Wilson,* for appellants.

*J. B. Perrymore, O. D. Thompson, Matlock & Matlock* and *Partain & Agee,* for appellee.

GRIFFIN SMITH, C. J. A jury in the Crawford circuit court found, from voluminous testimony and under instructions which are questioned by appellants, that Col. H. P. King did not possess the mental capacity to dispose of his property by will on March 27, 1930, at which time he executed a writing now before us.

At the time the testamentary expressions were subscribed to and witnessed, Col. King was 92 years of age. He died six years later. After directing payment of funeral and other expenses, and that all just debts be paid as expeditiously as possible, the will contains the following provisions: "I give and devise unto Rome Peevy, Isaac Peevy, George Peevy and Jesse Peevy, children of Mat Peevy and Mary Peevy, the sum of

$1,000 each, said sum to be paid to each of them by my executor immediately or as soon after my death as may be done. My adopted son, Charles T. King, has given me such trouble by violating the law and has caused me great expense. I therefore give and devise unto him the sum of $10 as his full share of my estate. The residue of my estate, real, personal and mixed, I devise and bequeath unto the Cumberland Presbyterian Church, in the United States, for the following purposes: Fifty per cent. of said bequest to the Cumberland Presbyterian Educational Endowment Commission, a corporation of the state of Tennessee, the interest on said fund to be used by said Commission for the support and maintenance of Bethel College and the Theological School at McKenzie, Tennessee. Twenty-five per cent. to the Board of Missions and Church Erection of the Cumberland Presbyterian Church, for Home Missions. Twenty-five per cent. to the Board of Ministerial Relief of the Cumberland Presbyterian Church, for the support and maintenance of Orphans' and Old Ministers' Home. I hereby nominate, constitute and appoint Sidney A. Pernot, of Van Buren, Arkansas, to be sole executor of this my last will and testament, and request and direct that he, as such executor, shall not be required to file any accounts current, or to do or perform any other act in the probate court touching the administration of my estate, other than to probate my last will and testament, giving to my said executor full authority, without order of court, to sell and dispose of any property, real, personal or mixed, of which I may die seized and possessed, which he may deem expedient to sell in order to pay the bequests herein made, or straighten up the affairs of my estate without undue delay. I give and devise unto the said Sidney A. Pernot the sum of $2,000 as and for his compensation for the work he shall do as executor of my estate, and direct that he withhold said sum from my estate for said purpose."

This will was admitted to probate in common form February 26, 1936. On September 29, 1936, Charles Thomas King, who is identified in the will as an adopted

son, filed his affidavit in the probate court of Crawford county praying an appeal from the order admitting the will to probate, and setting up as grounds of attack that undue influence was exercised by the principal beneficiaries in procuring execution of the will.

On October 29, 1936, Charles King filed a supplemental affidavit for appeal, charging (in addition to the previous allegation of undue influence) that at the time the will was signed H. P. King was insane; that the testator "Was not possessed of testamentary capacity and was not mentally competent to make and execute a will."

On November 2, 1936, the probate court granted the appeal, and notice was duly served upon Rome Peevy, Jesse Peevy, Sybil Peevy Rye, and Sidney A. Pernot. S. A. Pernot, as executor, and Cumberland Presbyterian Educational Endowment Commission, Board of Missions, and Church Erection of the Cumberland Presbyterian Church, and Board of Ministerial Relief of the Cumberland Presbyterian Church, beneficiaries under the will in question, filed their written response denying all allegations contained in the affidavits, except the allegations as to bequests in favor of such beneficiaries, and specifically denying the existence of insanity, or that undue influence was exercised.

The definition of "testamentary capacity" adopted by James A. Ballentine for use in his new law dictionary is: "The essential mental qualifications for the making of one's will, that is, a disposing mind and memory, which is one in which the testator had a full and intelligent consciousness of the nature of the act he was engaged in; a knowledge of the property he possessed, and an understanding of the disposition he wished to make of it by his will, and of the persons and objects he desired to participate in his bounty, or a knowledge of the natural objects of his bounty. This includes a recollection of the persons related to him by ties of blood and affection, and of the nature of the claims of those who are excluded from participating in his estate."

To the same effect, although differently phrased, are definitions adopted by this court. "The testator must have capacity to retain in memory, without prompting, the extent and condition of his property, and comprehend to whom he was giving it, and be capable of appreciating the deserts and relations to him of others whom he excluded from participation in the estate." *McCullough* v. *Campbell*, 49 Ark. 367, 5 S. W. 590; *Ouachita Baptist College* v. *Scott*, 64 Ark. 349, 42 S. W. 536; *Taylor* v. *McClintock*, 87 Ark. 243, 112 S. W. 405.

In the contest now before us it is shown that about the year 1900, H. P. King moved to the city of Van Buren, having, prior to that time, been a citizen of Crawford county, in which Van Buren is situated. Through close application to business, and in consequence of industry and economy, he had accumulated property of considerable value, and was regarded by his associates as a man of exceptional ability. During the period of participation by the United States in the World War—1917 and 1918—he converted most of his assets into cash and government bonds, and thereafter his activities embraced such duties as were incident to the investment of his funds.

His wife, Mrs. R. E. King, owned a separate estate worth approximately $30,000, acquired as a gift from her husband. After deducting this gift from the H. P. King estate, then valued at $115,000, it was estimated that the remainder, on March 27, 1930, amounted to $85,000.

Mrs. King, who died in 1928, left a will, in which her husband was named as sole executor. To sustain their contention that H. P. King was not wanting in testamentary capacity, appellants introduced evidence of the efficient manner in which he administered Mrs. King's estate. The total of these transactions amounted to more than $34,000.

The sixth paragraph of Mrs. King's will reads as follows: "I give and bequeath unto my dear adopted son, Charles Thomas King, $6,000, $5,000 of which shall be deposited in the bank at whatever rate of interest

the bank may be paying for money on time deposit, this deposit to remain in the bank at interest until my said son shall have arrived at the age of 35 years, and then paid to him absolutely. Of the remaining $1,000 I desire that $500 be paid to Gertha King, his wife, for her to use in getting him home and preparing a way for them to live until he finds work. Of the remaining $500 and interest derived from said deposit in bank, I desire that my adopted son be paid not to exceed $200 per year until he arrives at the age of 35 years. Should my said adopted son not live to be 35 years of age, then it is my will that the sum of $1,000 be paid to his wife, Gertha King, and the remainder of all funds bequeathed to him revert to and become a part of my estate, and be paid to Mabel Oney, Bettie Lee Mantooth and Wallace Mason Miller, heirs of William Mason Miller, deceased, share and share alike.''

Evidence on behalf of the contestants, condensed and not literally quoted, is substantially as follows:

J. A. Wetzell had been closely associated with Col. King for twenty years. Mrs. King was Wetzell's mother's youngest sister. King had pneumonia and influenza in 1929, and again in 1930. For two or three weeks during these periods of illness a nurse was employed. After Mrs. King's death, Charley King's wife was in attendance, and following her was Mrs. Raub who came in 1929 and remained eight years. Witness did not notice any change in Col. King until after an attack of pneumonia in 1929. Before that time King did not call witness to help with anything in connection with the business, but following the attack of pneumonia in 1929, witness was frequently requested to add figures and make calculations, the remark having been made by King that ''I'm not fit to do business.'' Continuing, the witness said: ''Sometimes he would not know me when I came into the room. He would talk about the Bible and ask me what I thought about a rich man going to Heaven. He was bothered about the Scriptures, where they say that 'It is easier for a camel to go through the eye of a needle, than for a rich man to enter into the

Kingdom of God.' He also talked about the rich young ruler, and about Lazarus and Dives. Sometimes a man from Cumberland College Home in Nashville would come to see him. He would say they were after him for more money. I went up there one morning and Uncle Henry told me that they said if he would give them all his money they would take him and keep him as long as he lived. He would frequently have the window shades drawn. He said it made it warmer and he was afraid of being kidnapped by Charley King, who was in Oklahoma. He was not 'right,' and that is my honest opinion. In 1935, he deeded me half of a lot. I sometimes borrowed money from him. He kept a set of books and kept down all of his expenses. I don't think he was able to attend to his property, but would not say that he was crazy on the day he made his will, or that anybody influenced him when he was making his will that day. I was not present. I would not have accepted the property he deeded me if I had thought he was crazy, although he was 'off' some of the time. Agents of the church had been going to see him for about twenty years. He was an elder in the church at Van Buren at the time the Cumberland Church united with the Presbyterian Church, U. S. A. After that he withdrew his membership at Van Buren and placed it at Dripping Springs. Charley had given quite a bit of trouble, but Mr. King was the cause of it."

Mrs. J. A. Wetzell testified: "Mr. King was 98 years old on the 17th day of December, and died on the 22nd day of February. He was about 92 years old at the time he made his will. He had a sick spell in 1927, and after that he was 'off' quite a bit. We couldn't keep him in bed and he would cuss. He quarreled about burning up electricity. He didn't know what he was doing. He would keep the shades drawn and said it would keep him warm."

In response to a hypothetical question, Mrs. Wetzell expressed the opinion that Mr. King did not possess the mental capacity to make a will in 1930. However, she did not think he was mentally deficient on March 23,

1932, when he deeded property to her and her husband. Asked on cross-examination if she had any recollection as to King's condition on March 27, 1930, she replied: "He was in his right mind." Q. "And you were guessing when you told the court that he was not in his right mind when he made the will?" A. "I don't know." Witness further stated that after making the will, King expressed fear of being kidnapped by his adopted son.

Mrs. Raub was with Mr. King when he died. "When I went there he had bad spells and weak spells and was never well. He would have pneumonia every winter. My employment began July 11, 1929, and his wife died in September, 1928. Sometimes he would get mad and wouldn't talk for two or three days. If the grocery bill ran over $10 a month he would quit the store. He would say they were trying to cheat him, and he wouldn't pay it. He would tell me that he could not support me any more and that I would have to help him; that if I didn't, he would be on the poor farm. Brother Fooks and Brother Walton of the Cumberland Presbyterian Church visited him during these years. The last time Mr. Fooks was there he told Mr. King that if he would make his will to them they would take care of him and pay him five per cent. interest. Mr. King's condition was bad at that time. It was necessary to talk loud to him. They talked to him about the disposition of his money and it worried him nearly to death. He would make me get up and talk to him about it. He was afraid if he did not give that money to the church he would not go to Heaven. After they would be there he would talk about the church and how he and Mrs. King lived. Sometimes he would not recognize people when they came to see him. He was mighty feeble as a whole and it was easy for people to talk him into doing things. There was something the matter with his mind."

On cross-examination Mrs. Raub said: "I worked for Mr. King seven years and tried to get him to raise my wages, but he tried to cut them. He wouldn't be influenced along that line. I filed a claim against his estate for a thousand dollars and was allowed $846. About a

year before Mr. King died he made arrangements for payment to me of $1,000 at his death. He kept an accurate account of all his expenditures. He knew who all of his relatives were. He gave his nephews $1,000 apiece and had given them money prior to that time. The time Mr. Fooks and Mr. Walton visited him was about a year ago.''

Miss Ola Benson served as a nurse in the King home for six weeks in 1928, attending Mrs. King, but left before Mrs. King died. She testified: ''I had occasion to notice Mr. King. I could not see that he ever did anything out of the ordinary, but he was very close and awfully childish. I think it was his age. He complained about providing food for his wife. He told me that between me and the doctor he was going to spend his last days in the poor house. He complained about the doctor's prescriptions, and did all the grocery buying himself, and would never buy enough. He tried to cut my wages and said that he wasn't able to pay. I would not think that he was competent to make a will in March, 1930. He was suffering in 1928, and I don't think he was himself.''

On cross-examination Miss Benson testified: ''Mr. King agreed to pay me $4 a day, but asked me once to work for less. He wanted his wife to have everything that she needed, but said it was foolishness. He followed the doctor's advice until the finish.''

W. R. Willis testified: ''I am in the real estate business and knew Henry P. King for twenty-four years. I had an opportunity to observe him during the last few years of his life. He was gradually getting weaker in mind and body. I would sometimes stop and bring him to town. He said he would save a nickle by riding with me. This was prior to 1930. The last thing I remember about him was on one occasion in front of my office when he walked up to me and asked me where the bank was. The bank was about a block and a half from my office and had been located there many years. Mr. King had been president of the bank at one time. I do not

think that he was competent in March, 1930, to make a will.''

On cross-examination Mr. Willis testified that, in 1936, he took Mr. King's acknowledgment to a deed, but that his duties as notary public did not require him to test the competency of a person. ''I think he knew what he was doing when he executed the deed to which I took the acknowledgment. He was not competent for the last seven years. He was competent some of the time. He knew what he was doing some days.''

Luther Buel, who had been police judge in Van Buren for 3½ years, and constable for 16 years, testified that he had known Mr. King for fifty years. ''I often came in contact with him on the street. Once he asked me where the bank had been moved to and I said, 'The bank is where it has always been.' One time he asked me where the post office was. He was about one block away when he asked me about the bank. It was the Crawford County Bank of which he had at one time been an officer. The post office had been in its present location about 20 years. About four or five years ago I saw him in front of Scott's barber shop crying, and took him inside and called Dr. Savery. I thought he was acting kinda queer. Really, I do not think he was competent to make a will in March, 1930; but I don't know what his mental condition was at that time.''

Hugh Miller, who had served as jailer, assessor, chief of police, and county treasurer, and had known H. P. King all his life, testified: ''During the last six or seven years it seemed to me he was getting weak in mind and strength. I was in the bank for 12 years and he had a lock box there and kept his valuable papers there, and he would visit there very often. He would get the box out and spread the things on the table and just get up and walk off and leave them, and we would have to gather the things up for him and put them away. The last few years he was quite a bit weaker. I have ridden on the street cars and buses with him several times. The motorman would have to tell him where he was. He did not have the mental capacity to make a will in March,

1930. When talking to me he mentioned about his property, and said he knew what he was doing, and that he did not want some of the folks to have anything.''

Joe Simpson testified: ''In 1929 I tried to make a deal with Mr. King to paint his house, but I never could deal with him. In 1930 I met him on the street in front of the shoe store and he wanted to know where the bank was. He was about 150 feet away from it at the time. At another time he was standing across the street in front of the bank and I took him over to it. I don't know about Mr. King's mental condition on March 27, 1930.''

Claud Peevy testified that H. P. King was his great uncle; that he had known Mr. King all of his life; that Mr. King had a spell of pneumonia in 1929, and after that he was quite different. ''At times when I would go in up there he wouldn't know me. He would say, 'I am going crazy,' and would sit and talk about his money and complain about the noise. On January 23, 1936, he deeded me his home place, but his mind was bad at that time. I let him make the deed because I felt I was entitled to the property. I did some figuring for Mr. King. His eyesight was bad during his later years. He would call on me because he couldn't see how to do the work.''

Dr. John M. Steward, 50 years of age, and a graduate of Vanderbilt University, had been practicing medicine for 25 years. He was called to wait upon Mr. King in 1930. ''I found him suffering from neuritis in the arm, and his mental condition was extremely poor. He couldn't give me intelligent answers to questions. He wouldn't do what I told him to. I attributed that to age and hardening of the blood vessels, which tends to decay and poor drainage. Mr. King was 98 years old when he died. Senile dementia is a condition that often occurs after the age of 60 and appears more commonly between 60 and 70. It may be caused from illness or from worry. A person will get forgetful. He may become violent. It affects a person so he will have ideas as to his financial condition. A man with money may decide it is getting away from him, or that he will be sent to the poor house. There are other hallucinations. You feel like sometimes

you will come to bodily harm, and one feels like his friends will try to take what he has. I have heard the statements made here as to what the law is for testing the capacity of a person in disposing of property and in making a will, and based upon my observations and my examination of Mr. King, and in view of my experience and training in handling mental cases, it is my opinion that Mr. King was in no condition in 1930, and up to the time of his death, to dispose of $100,000 in any way and it be square.''

Dr. Stewart later explained that his reference to $100,000 was merely by illustration, and that the amount involved in the will was not controlling. Asked if his opinion would be altered if it should be shown by competent testimony that Mr. King, as executor of his wife's estate, had handled receipts and disbursements amounting to more than $30,000 and had kept accurate accounts and made proper reports, the doctor replied, ''I have no 'if.' I said that in my opinion Colonel King was not mentally able to dispose of his property. If he had been in the habit of keeping records for ninety years he would continue that as a habit. That is a characteristic of one in his condition.''

Dr. H. C. Drosey, a graduate of Tulane University who had done post-graduate work in New York and was connected with the Holt-Krock Clinic and the Sparks Memorial Hospital and St. Edward's Hospital of Fort Smith, said that he had had a great deal of practice in connection with diseases of the mind, and that it was scientifically recognized that senile dementia affects the mental character after the age of 70, 75, and 80, being more pronounced after the age of 80. ''Sometimes people become very forgetful, irritable, and set in their minds, and friendship often turns to hatred. They often turn against their own folks.''

In response to a hypothetical question, he stated that, in his opinion, Mr. King was not able to make a will ''as it should have been.'' He had never seen Mr. King and knew nothing of his mental or physical con-

dition except what he had heard from witnesses in the court room.

Dr. S. D. Kirkland had known Mr. King, but had never treated him. The effect of his testimony was to substantiate scientific conclusions given by his fellow-physicians.

Dr. Kirkland would not be convinced that Mr. King had kept administrative records of his wife's estate in a proper manner. He said: "Even if the testimony shows that he kept an accurate account of all the expenditures, and kept an accurate set of books of the assets and real estate, and filed all of his reports in his own handwriting—even if all that is shown in evidence, I would still testify that he was incompetent, and it will never be shown to my satisfaction."

The allegations of undue influence are bolstered by unsubstantial testimony. There are comments and allusions by witnesses for appellee that from time to time representatives of the church called upon Mr. King, but no specific act is pointed to which in itself sheds light upon the charge.

Col. King, for many years, and his wife, had been members of the Presbyterian Church. If its ministers and business agents are shown to have visited the Van Buren capitalist, that is not evidence of a sinister plan to overreach his better judgment.

Can it be said that one whose material activities have responded to the touch of fortune should draw the blinds and close his doors to men of the church, or that he must spend the sunset of life in a situation removed from the society of those who labor for the objectives here disclosed?

Appellants' energies are also directed to the allegation of mental incapacity. But here, again, a stumbling block is reached, for, subject only to such limitations as the statutes have imposed, "The law leaves everything to the unfettered discretion of a testator, on the assumption that, though in some instances caprice and passion, or the power of new ties, may lead to the neglect of claims that ought to be attended to * * * nothing short

of mental unsoundness * * * will avoid a will. Moral, or what the books term 'medical,' insanity—a perversion of the sentiments and affections—manifested in jealousy, anger, hate, or resentment, however violent and unnatural, will not defeat a will unless the emanation of a delusion.'' *Taylor* v. *McClintock*, 87 Ark. 243, 112 S. W. 405.

What is the proof that H. P. King was insane?

It is not that his neighbors or friends, prior to execution of the will; or thereafter—or, for that matter, at any time—were apprehensive as to his status. Self-willed, independent, aggressive, frugal, conservative and careful, he met the requirements of all emergencies until partial blindness and illness intervened. Then, occasionally—but not always—he called on others for assistance. He inquired as to the location of a bank with which he had formerly been identified; but no significance attached to this manifestation until restrospective speculation found value in its use.

In 1929, and again in 1930, Col. King had pneumonia, and influenza. So have multitudes. He thought and bluntly told attendants that the physician was incompetent. He didn't want to pay a nurse. Sometimes he would not know when J. A. Wetzell entered the room. Is it evidence of insanity that a man with failing sight may urge economy, or seek to employ a nurse at a price cheaper than was asked, or decline to have his house painted, or ask a relative to assist with mathematical problems? Is it suggestively unnatural that, after making a will disinheriting an adopted son who had forged checks, served in the reform school, and done ''time'' in the penitentiary, it should have occurred to this old man that information as to the contents of his will might be carried to Charlie King, and that rage and desperation at such knowledge might prompt retaliation? It is a matter of common knowledge that men have been kidnapped for less than $85,000.

Mrs. Raub says it was necessary to speak loudly to Mr. King, and this is urged as a circumstance in favor of insanity. They also talked to him about the disposi-

tion of his money, and this occasioned worry. One witness testified that "sometimes he would not recognize people when they came to see him." Another witness, who thought that Col. King was incompetent in 1930, took the Colonel's acknowledgment to a deed in 1936, but failed to notice any abnormality. And so, on and on.

In almost every instance where a witness testified to mental incapacity, a qualifying explanation, or a disarming admission on cross-examination, or circumstance incidental to observations, or the time fixed as a basis, was such as to negative allegations of continuous incapacity. Where one witness (naming a time and fixing a place) would give evidence of some action or transaction which, in connection with other testimony and circumstances might have had probative value, the continuity of such evidence was broken by testimony as to perfectly rational conduct—conduct of such a natural character that at best appellees can only claim that there were intervals in the closing years of Col. King's career when he labored under stress of sickness, or when the infirmities of age slowed his pace and dimmed his vision, or affected his hearing. It is likewise inferable that his memory was less acute than it had been in former days.

Mere age is not necessarily inconsistent with testamentary capacity. "Indeed, the mental faculties may be weakened and impaired by old age without destroying such capacity. The mere fact that an aged testator's memory is failing, or that his judgment is vacillating, or that he is becoming eccentric, or that his mind is not as active as formerly—these things do not invalidate his will if it was fairly made and he was free from undue influence. While age is not of itself a disqualification, yet it excites vigilance to see if it is accompanied with capacity."—Thompson on Wills, § 62, pp. 88-89.

In *Puryear* v. *Puryear,* 192 Ark. 692, 94 S. W. (2d) 695, in holding that the evidence was not sufficient to sustain the judgment setting the will aside, we said: "The contents of the will, the manner in which it was written and executed, the nature and extent of the testator's estate, his family and connections, their condition and rela-

tive situation to him, the terms upon which he stood with them, may be inquired into in determining the testator's capacity * * *. Neither feebleness of intellect nor physical suffering is sufficient to render a will void unless so great as to render the testator unable to appreciate the consequences of his acts."

Again, in the same opinion, it was said: "If the witnesses testify that the testator is insane, but give as a basis for such opinions facts which do not justify them, their evidence on this point is worthless, and cannot support a verdict in favor of a contestant." See, also, *Huffaker* v. *Beers,* 95 Ark. 158, 128 S. W. 1040; *Boone* v. *Boone,* 114 Ark. 69, 169 S. W. 779; *Mehaffey* v. *Mehaffey,* 174 Ark. 1153, 298 S. W. 492.

From these opinions, and from the holdings in others of similar purport, we conclude that, in considering testamentary capacity of a man 92 years of age whose will it is sought to avoid by evidence showing (a) insufficient vision, (b) curtailed hearing, (c) diminishing memory, (d) so-called "childishness," (e) failure at times to recognize old friends or to locate familiar places, (f) a marked tendency toward economy to a point approaching penuriousness, (g) and kindred actions, it is of paramount importance, as was said in *Puryear* v. *Puryear,* to consider such testator's family and connections, their condition and relative situation to him, and the terms upon which he stood with them.

Applying these rules to the instant case, what results do we attain? It is shown by appellants that while Chancellor C. M. Wofford was practicing law in Van Buren, Col. King employed him to draft his will. This was in 1926, a period prior to which no witness has testified to any fact or circumstance indicating that Henry P. King lacked testamentary capacity. No effort was made, in preparing this record, to question the Colonel's mentality in 1926, even though a wide range of latitude was open to the introduction of testimony. Judge Wofford's testimony follows:

"I am chancellor of the Tenth district of this state and have been for six years. I have also been county

clerk, prosecuting attorney, and city attorney of Van Buren. I first knew H. P. King about 1903 or 1904. I became his attorney some time in 1924 or 1925 and looked after his legal business from that time until I was elected chancellor. I wrote his will two different times—the first time in the fall of 1926, the second time in 1930. I do not have a copy of the 1926 will. It is lost. In the 1926 will he gave some property to his wife. She was living then and it was his purpose to give her money while she was living. He gave her some lots, and gave some distant relatives $500 each. He gave his adopted son a very small amount, $10 I believe. It may have been $100. He said that he and Mrs. King didn't have a son and they adopted this boy and had become much attached to him, but as he grew older he became wild and violated the law and that he had been to the reform school; and he discussed the trouble that he had been into and said he didn't seem to have any idea what money was for; and he said, if I go and leave that boy a lot of money he will waste it and spend it; and he requested that I write his will. He made a bequest to the Cumberland Presbyterian Church, to the School and the Board of Missions.

"I asked him why he didn't give some of his estate to the schools and churches here in Van Buren or locally. He and I had been on intimate terms for years, and he said there was a split in the church and we were attached to one wing and they had thought about these things and he stated that they went along for a while and that he had always paid his taxes and he stated that the Lord had given him what he had and he intended to use it for Him. He said that he and his wife had talked it over and decided what they wanted.

"At the time I wrote his will, he recalled in his memory without prompting the condition of his property and so stated to me. In my opinion, he was fully aware of the bequests that he made. I am a judge and have been a lawyer for a long time and recognize the requirements for testamentary capacity, and in my opinion Mr. King certainly met those requirements. The wit-

nesses to Mr. King's 1926 will were Edgar Covey and Johnson Moore. At that time Col. King was a depositor, stockholder, and director in the bank.

"In the will which I wrote for Mr. King March 27, 1930, there were no material changes from the provisions of the 1926 will except the names of the institutions of the Cumberland Presbyterian Church. He came to my office with a representative of the church and said they had incorporated the names later, the names that he had given me when I wrote the first will, and the will was rewritten. The second will was the correction of the corporate names of the institutions mentioned in the 1926 will. I handled other legal business for Mr. King and I think I wrote Mrs. King's will two different times. Mr. King was executor of her will * * *. I know for a fact that Col. King was rather strong physically up until the last two or three years of his life. Up until that time he would discuss business with me. He was converting his estate into bonds and cash. He realized that he was getting older and wanted to leave it in liquid form. He handled his business as well as ever and I am sure in my mind that at the time he made his will he was just as capable of executing a will as any man sitting around this table. In discussing his church relationship he spoke of a split or division of the church and said his wing got the worst of it and needed help, and that it was his duty to give what he had. I had occasional social contacts with him and never noticed anything to indicate a lack of testamentary capacity."

On cross-examination Judge Wofford testified as follows:

"When I wrote the first will in 1926, as I recall, no one was present but my stenographer. I had taken down a list of data and wrote the will later. When he came in 1930 and requested the will to be rewritten, some representatives of the Cumberland Presbyterian Church came with him. The man who came with him gave me the correct names of the institutions of the church and I wrote them down and Col. King ordered every change that I made and he ordered me to make one or two

changes from his former will. In his former will he gave $500 to each of his relatives and in his later will he gave them $1,000, and there was maybe one smaller change in it. The percentage of the bequests in the first will was carried into the last will. As a matter of fact, the only change in the second will was as to the names of the institutions of the Cumberland Presbyterian Church that he made the bequests to, and also to increase the bequests to some of his relatives. I think he gave Charles T. King the sum of $10 in each will. He said he did this because he had violated the law and caused him a great deal of expense. It is my recollection that the boy had been in trouble over quite a number of years. I was counsel for Col. King about five years. I ceased to be his attorney when I was elected chancellor."

Other witnesses testified to the sanity, normal conduct, and naturalness of Mr. King before and after 1930. Among the witnesses so testifying for appellants were the witnesses to the will. But enough has been quoted to meet the requirements of this opinion.

The relationship and situation of Charlie King to his benefactor were unsatisfactory. Ties of affection had been broken, and in Col. King's mind there was a definite purpose to disinherit. This intent was formed prior to 1926, and it was re-expressed in the will of 1930. On the personal side, the testator was visibly worried over the problem of his soul's salvation. Others have been likewise baffled and perturbed. Indeed, "There was a certain rich man, which was clothed in purple and fine linen, and fared sumptuously every day: And there was a certain beggar named Lazarus, which was laid at his gate full of sores, and desiring to be fed with the crumbs which fell from the rich man's table: moreover the dogs came and licked his sores. And it came to pass that the beggar died, and was carried by the angels into Abraham's bosom: the rich man also died, and was buried; and in hell he lifted up his eyes, being in torments, and seeth Abraham afar off, and Lazarus in his bosom. And he cried and said, Father Abraham, have

mercy on me, and send Lazarus, that he may dip the tip of his finger in water, and cool my tongue; for I am tormented in this flame. But Abraham said, Son, remember that thou in thy lifetime receivedst thy good things, and likewise Lazarus evil things: but now he is comforted, and thou art tormented.''

Perhaps some memory of these words may have agitated the mind of Henry P. King as the shadows began to gather. It is a propitious thought, and often becomes the accompaniment of advancing years and declining health; yet it cannot take the place of substantial evidence of insanity. Nor does the 19th chapter of St. Matthew, quoted by appellee's witnesses as having puzzled Col. King, bolster appellee's argument. With an estate of $85,000 in liquid form, and without children of his own, it is not strange that Mr. King should have given earnest thought to the formulae of eternal life. ''And, behold, one came and said unto him, Good Master, what good thing shall I do, that I may have eternal life? And he said unto him, Why callest thou me good? There is none good but one, that is, God: but if thou wilt enter into life, keep the commandments. He said unto him, Which? Jesus said, thou shalt do no murder, thou shalt not commit adultery, thou shalt not steal, thou shalt not bear false witness; honor thy father and thy mother: and, thou shalt love thy neighbor as thyself. The young man said unto him, all these things have I kept from my youth up: what lack I yet? Jesus said unto him, If thou will be perfect, go and sell that thou hast, and give to the poor, and thou shalt have treasure in heaven: and come and follow me.''

Though situated somewhat differently, and conducting his worldly affairs in an atmosphere more than two thousand years removed from the coasts of Judea beyond the Jordan, Col. King seems to have substantially followed the advice of One whose teachings have never been successfully urged as an evidence of insanity. Therefore, we are not willing to say, in the circumstances reflected by this appeal, that when Col. King selected the church as an object of his bounty in preference to an

adopted son who had harassed and humiliated him, such testamentary conduct, when viewed with other evidence, was sufficient to import the bewildering spectre so graphically portrayed by assisting experts as the hand-maidens of senility.

> "Though now this grained face of mine be hid
> In sap-consuming winter's drizzled snow,
> And all the conduits of my blood froze up,
> Yet hath my night of life some memory."

The judgment is reversed, and the cause remanded with directions to reinstate the will.