BOLLINGER *v.* ARKANSAS VALLEY TRUST COMPANY, EXECUTOR.

4-6285                                             151 S. W. 2d 675

Opinion delivered May 19, 1941.

[redacted]

*Warner & Warner,* for appellant.

*Hill, Fitzhugh & Brizzolara,* for appellee.

McHANEY, J.   Appellants are three of the four heirs at law of Rudolph C. Bollinger who died testate in Fort Smith, Sebastian county, March 27, 1940—a son, C. R. Bollinger, and two daughters, Mrs. Ida Leard and Mrs. Lillian Galloway. A third daughter, Mrs. Emma Hollingshead, is not a party to this litigation, but her daughter, Mrs. Doris Duncan, a granddaughter of the testator, is the principal beneficiary under the will.

The will was filed for probate March 30, 1940, and appellants objected to its probate on the grounds of testamentary incapacity and undue influence of the principal beneficiary.   Trial resulted in a finding, on May 31, 1940, against appellants on both grounds, that is, that the testator had mental capacity to make said will, and that its execution was not procured through undue influence of Doris Duncan or any other person, and an order was accordingly made and entered admitting said will to probate.

In the first paragraph thereof, the testator appointed appellee as his executor and directed it to pay his just debts, funeral expenses, the legacies thereinafter given and all inheritance taxes and other charges against his estate.   In the second paragraph he gave to his two daughters, appellants, $500 each and to his son, appellant, and Mrs. Hollingshead, his daughter, $1,000 each, all upon condition that they should "not in any manner contest or oppose the probate of this will or contest the same after it may have been probated," under the penalty of forfeiting the bequests named, and they "shall have no interest in such property (of his estate), either under this will or under the laws of descent and distribution." In the third paragraph he said: "I give, devise and bequeath unto the Arkansas Valley Trust Company, a corporation of Fort Smith, Arkansas, as trustee for my granddaughter, Doris McTavis, (now Doris Duncan), all

of the rest, residue and remainder of my estate, of every character and description, including any part thereof that may be forfeited by any of my children under the provisions of the second paragraph of this instrument.

"The purpose of this paragraph being to vest in said trustee all property owned by me at the time of my death, after the payment of my just debts, funeral expenses and all other charges against my estate, and after the payment of the above mentioned bequests to my four children, as provided in the second paragraph hereof." In the fourth, fifth, sixth and seventh paragraphs powers and directions are conferred upon and given to the trustee relative to the management and disposition of the estate, the net income from which shall be paid to his said granddaughter in monthly installments, or if she should die before his death, leaving issue surviving her, then such trust estate shall be held for the benefit of such living issue, such trust to continue for 20 years after his death, at which time it should be turned over to said beneficiary.

Twenty witnesses were produced by appellants and twenty-five by appellee, making a large record of some 600 pages. We have carefully considered their testimony as abstracted by counsel for both sides, as also the opinion of the trial court based thereon, and we agree with the trial court and appellee that the great preponderance of the evidence shows not only that the testator was mentally capable of making a valid will, but that he was not unduly influenced in so doing by the principal beneficiary. We cannot undertake to review all this testimony pro and con, or pro or con.

The three appellants, vitally interested in the outcome expressed the view that their father was mentally incompetent, not only at the time of making his will, April 28, 1934, but that he had been so for several years prior thereto. They testified to his failing memory, his forgetfulness, giving instances thereof, and to some peculiarities and eccentricities of their aged father and are corroborated in certain respects by other witnesses. He was 77 years old at the time of making his will and died at

the age of 83. The testator and his wife had been living together as husband and wife for upwards of fifty years at her death in April, 1934. Each was the owner of substantial property. In 1920 they went to one of counsel for appellee and had him draw a will for each of them. Mrs. Bollinger's will gave to the children $1,000 each and all else of her estate to her husband, if he survived her, if not to the children equally. In March, 1927, they again went to their attorney's office and had him make new wills for them. Mrs. Bollinger's will was substantially the same as her former will, except she created a trust for her children for 10 years, in the event her husband predeceased her. But if he survived her, the provision was the same as in the 1920 will. In May of the same year, they again called on their attorney to draw new wills, but the only change was in the executors named in the wills. Her will, drawn in May, was executed in June, 1927, and was probated April 6, 1934.

Mrs. Bollinger had owned for many years a building on Garrison Avenue, the principal business street in Fort Smith, known as the Bootery, valued by the executor at $30,000 to $35,000. A few months before her death, her brother, William Wegman, died intestate, and she inherited a net estate from him of $40,000. A year or more prior to her death, she became mentally deranged, but there is no substantial evidence of her incapacity to make a will in 1927. Notwithstanding this fact the children contemplated and threatened a contest of their mother's will because of her mental incapacity to make it, and as a result thereof, after several weeks of consultation and bargaining, a written agreement dated April 27, 1934, was entered into by and between the father and his children whereby each received from their mother's estate so given him in her will about $10,000 or a total of $40,000. On the very next day, April 28, 1934, Mr. Bollinger went to his attorney's office and executed the will now attacked for lack of mental capacity to make it. It is agreed that his mind was as good on April 28, 1934, as it was the previous day, and it was good enough on that day for him to make a written contract with them

by which each received $10,000. In this written contract of settlement he was given a certain property on Garrison Avenue on condition that he would not sell or encumber same during his lifetime, but "that this agreement shall not prevent the said party of the first part (testator) from disposing of said property by valid will." This was a recognition by them that at that time he was capable of making a valid will.

On account of this experience with his children, no doubt, Mr. Bollinger decided to forestall, if possible, a successful contest of his will by them on account of lack of testamentary capacity. So, he advised his attorney that, before executing the will, he would be examined by two capable physicians and he was so examined. They made written favorable reports of his testamentary capacity, which he placed with his will in his lock box, and shortly before he died, he turned them and the will over to his attorney. He was examined by Dr. Foster of the Cooper Clinic and by Dr. Krock of the Holt-Krock Clinic, and the latter testified for appellee in this case to the effect that he was mentally competent.

There are many other facts and circumstances, both before and after April 28, 1934, tending strongly to show his mental ability. He testified as a witness in one or more divorce cases of his said granddaughter, Doris, she having been married six times and divorced five times. He also testified as a witness in his son's bankruptcy proceeding. He collected his rents, made minor repairs to his rental houses, renewed a contract of lease for a term of years on the Bootery property at an increase of $10 per month rental, borrowed substantial sums of money from his bank by executing notes therefor, consulted with Mr. Andrews relative to his life insurance contracts and closed them out, consulted with his attorney on various matters, and all of these parties with whom he transacted business noticed nothing wrong with him mentally. Of course there was testimony from appellants, a brother of the testator and others that tended to show lack of capacity. But as said in *Pernot* v. *King,* 194 Ark. 896, 110 S. W. 2d 539, "In almost every instance

where a witness testified to mental incapacity, a qualifying explanation, or a disarming admission on cross-examination, or circumstance incidental to observations, or the time fixed as a basis, was such as to negative allegations of continuous incapacity.'' For instance, when appellants say their father was incompetent as far back as 1930, they are at once confronted with a solemn written contract or assignment between father and son, by which his business as a musical instrument dealer should be wound up, liquidated and his debts paid. When they say he was incompetent on April 28, 1934, they are immediately confronted with their written contract with him by which they each received from him $10,000. No wonder the trial court did not accept their testimony as true, in the face of their own business dealings with him as well as a mass of other evidence showing ordinary everyday business transactions attributable only to a person of sound mind and memory.

What constitutes testamentary capacity has been many times stated or defined by this court. *McCullouch* v. *Campbell,* 49 Ark. 367, 5 S. W. 590; *Ouachita Baptist College* v. *Scott,* 64 Ark. 349, 42 S. W. 536; *Taylor* v. *McClintock,* 87 Ark. 243, 112 S. W. 405; *Puryear* v. *Puryear,* 192 Ark. 692, 94 S. W. 2d 695; *Pernot* v. *King, supra.* All of them are to the effect that, if the testator has ''capacity to retain in his memory, without prompting, the extent and condition of his property, and comprehend to whom he was giving it, and be capable of appreciating the deserts and relations to him of others whom he excluded from participation in the estate,'' he has testamentary capacity. While some of us might think he dealt unjustly with his children, we think his mental capacity was established by the great weight of the evidence and, of course, he had the right to dispose of his property as he saw fit.

As to the alleged undue influence of the principal beneficiary, we think little need be said. There is no doubt that she has been a headstrong, spendthrift girl, committing many acts of indiscretion. Many marriages and divorces are to her credit or discredit. Doris came to live with her grandparents when she was about 12

years old and has continuously resided with and been supported by them, together with her various husbands, with one exception. Strong ties of love and affection grew up between her grandfather and her, and it may be that her unconventional disposition drew him more closely to her, which resulted in the creation of this spendthrift trust by him. There is no doubt of her extravagance and of his yielding disposition or her importunities, but there is no substantial evidence in this record that she had anything to do with the making of this will or that she knew it had been done until sometime afterwards. One or more of appellants testified that she told them they would get nothing out of their father's estate—that she would attend to that. Her then husband, McTavis, accompanied Mr. Bollinger to the attorney's office at the time the will was drawn, but he was not in the room where it was drawn and did not know what it contained. In *Lavenue* v. *Lewis,* 185 Ark. 159, 46 S. W. 2d 649, where fraud and undue influence were charged to defeat a will, we quoted from *McCullouch* v. *Campbell, supra,* where it was said that ''the fraud and undue influence which is required to avoid a will must be directly connected with its execution. The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion, or any other cause that deprives the testator of his free agency in the disposition of his property. And the influence must be specifically directed toward the object of procuring a will in favor of particular parties. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relations with them at the time of its execution.'' Judge BATTLE quoted the above in *Smith* v. *Boswell,* 93 Ark. 66, 124 S. W. 264, as also the following from 3 Elliott on Evidence, § 2696: ''The influence of the husband over the wife, that of the wife over the husband, of the parents over the children, and of the children over the parents, are legitimate, so long as they do not extend to positive dictation and control over the mind of the testator.''

When viewed in the light of these rules, the evidence wholly fails to show any undue influence of the kind the law recognizes. Doris, no doubt, had great influence with the testator, but not an "undue influence" as above defined.

We are, therefore, of the opinion that the order of the probate court, admitting the will to probate, is correct, and it is accordingly affirmed.