RAMSEY v. RAMSEY.

4-9893                                           253 S. W. 2d 219

Opinion delivered December 8, 1952.

*Kenneth C. Coffelt,* for appellant.

*Ernest Briner,* for appellee.

GRIFFIN SMITH, Chief Justice. The Chancellor found that when Daisy L. Ramsey deeded lands to her son, George T. Ramsey, in 1937, she was mentally competent. The action to cancel was brought by those who, but for the deed, would have inherited various interests. Nine children were born to T. F. and Daisy Ramsey. Certain individuals doing business as Capitol City Lumber Company, and the company as an entity, were made defendants because George Ramsey had sold timber for which $5,000 was received.

Daisy Ramsey had been married to T. F. Ramsey. The two were separated "in the early '20's". In 1928—a divorce having been decreed—the land now contended for was deeded to Daisy. Seemingly all parties at that time regarded Mrs. Ramsey as mentally competent, although there was testimony that as early as 1907 symptoms of nervousness were discernible. The witness who held this view thought another breakdown occurred in

1917, after which Mrs. Ramsey improved, but by 1925 she was again noticeably affected. Several "bad spells" were thought to have occurred from 1930 to 1935. Another witness thought Mrs. Ramsey got violent in 1934, and in 1936 and 1937 "she was in pretty bad shape".

This was the general trend of testimony by persons called by the plaintiffs (appellants here), although some of them did not notice any difference in Mrs. Ramsey's condition between 1928 and 1939 when she was committed to the Louisiana State Hospital at Pineville. Witnesses supporting the defendant's contention that his mother was competent had noted her conduct and habits for years and did not observe unusual tendencies or evidences of subnormal mentality. Opinion witnesses called by the plaintiffs, including a psychiatrist, did not think Mrs. Ramsey was capable of transacting business in 1937. Dr. Fletcher's answer to hypothetical questions was in line with beliefs expressed by lay-witnesses; but on the other hand there was no direct proof that rational periods did not exist unless general terms used by some of the witnesses are to be construed in that manner.

A circumstance tending to show that after receiving the deed George Ramsey considered that his brothers and sisters had a remaining interest is the fact that after selling the timber he (George) offered Ohlas W. Ramsey a check for $500 "for his part" if a quitclaim deed were delivered. Wilburn Ramsey asserted a similar offer, made in 1947. Wilburn testified that George settled with H. C. Ramsey, but H. C. did not say what he received.

A. L. Carson, justice of the peace who acknowledged the mortgage, executed by Daisy Ramsey to her son, testified that he had lived in Saline county since 1893 and had known Daisy ever since he came to the state. He lived within two or three hundred yards of her. Mrs. Ramsey came to him to have the acknowledgment taken and appeared "fair like myself—never very brilliant". From daily observations it was the opinion of this witness that Mrs. Ramsey acted like any ordinary person. Some of the defendant's witnesses admitted they had heard that Mrs. Ramsey "had spells", but these state-

ments were usually qualified by the remark that "she was always normal when I met her".

L. Jean Cook, a Texarkana lawyer, identified the deed Mrs. Ramsey executed in favor of George. Cook was a notary public in 1937 when Mrs. Ramsey and George came to his office. His stenographer prepared the deed. Mrs. Ramsey was not in the presence of this witness for a protracted period, but he did recall that after the business in hand had been finished there was talk about other matters. His best judgment was that Mrs. Ramsey was "all right mentally".

It was George Ramsey's contention that over a long period of time he had substantially assisted his mother. He had also helped personally and financially with the younger children. It was his mother's idea that the $800 mortgage be executed to the end that he be protected. In 1937 when the deed was delivered Mrs. Ramsey was 57 years of age.

We know judicially that 1932 and succeeding years prior to World War II were marked by a financial depression and that lands generally were not readily marketable at a satisfactory price.

We do not, of course, know that a particular tract of land was not desirable at a specified time. But in the case at bar George Ramsey testified that some of the value evidenced by the mortgage came into existence when he improved the farm house in 1932. The rear portion of the main dwelling had been built in 1893. Two rooms were added in 1907, making five rooms in all. The work of remodeling begun in 1932 continued for almost a year. It included an extra room, painting, canvassing and papering. A large front porch and a long, narrow back porch were added. With a new roof the improvements had cost a great deal more than had been anticipated. While this work was going on he bought all of the groceries for the family and paid some of his relatives for work they did. Sixty-four checks were referred to representing expenditures of more than $3,000 from 1943 to 1948. The plaintiffs, he said, knew that the work was being done and they stood by and per-

mitted it to continue. In summation Ramsey estimated that he had spent more than $9,000 for improvements.

Mental capacity to dispose of property, and the existence or absence of undue influence, are factual considerations. There is convincing proof here that George was favored, but the evidence is just as convincing that he entertained greater solicitude for his mother's welfare than did the other children, thereby meriting a somewhat higher degree of affection and material consideration than would otherwise have been the case. For 27 years George had been a postal transportation clerk receiving a regular salary. There is preponderating evidence that he had the financial means to do the things now claimed to have resulted in benefits to his mother, and the Chancellor could have found that the other children were either unable or unwilling to make cash expenditures during the depression years.

That Mrs. Ramsey was not under restraint prior to 1939 is undisputed, and probabilities disclosed by testimony are that in 1932 the land was not worth a great deal more than the amount for which it was voluntarily mortgaged.

An approved definition of mental capacity in its application to the issues here is to be found in *Pernot* v. *King,* 194 Ark. 896, 110 S. W. 2d 539. It includes a recollection of the persons related to the grantor or testator by ties of blood and affection, "and of the nature of the claims of those who are excluded from participating in the estate". There are citations to cases where in effect it was said that the testator must have capacity to retain in memory, without prompting, the extent and condition of his or her property, and comprehend to whom it is being devised; and [she] must be capable of appreciating the deserts and relations [to her] of others who are being excluded from participation in the estate.

Tested by these rules we are not able to say that the Chancellor reached an erroneous result. As a part of the record there appears a writing executed by Daisy Ramsey in 1937 about the time the deed was delivered. George

Ramsey testified that he asked his mother for a memorandum of dates (births and deaths) respecting immediate members of the family. Paper, pen, and ink were supplied and she made out the list photographed below:

There is no contradiction of testimony given by George that the request was willingly complied with and the work executed without suggestion or prompting—that is, no contradiction other than that implied by law when an interested witness is testifying.

If, as the Chancellor believed, Mrs. Ramsey was able in 1937 to remember these names, dates, etc., and to follow a course of social demeanor avouched by many of the witnesses, her action in executing the deed was voluntary and she had sufficient mentality at that time to meet the tests heretofore referred to.

Affirmed.