LYNCH v. GARNES.

5-1191                                         301 S. W. 2d 739

Opinion delivered April 29, 1957.

[Rehearing denied June 3, 1957]

*Luke Arnett* and *John F. Park,* for appellant.

*Linwood L. Brickhouse, Langston & Walker* and *Wayne Foster,* for appellee.

ED. F. McFADDIN, Associate Justice.   This litigation involves the dealings and transactions between the appellant, S. J. Lynch and Mrs. Annie Engelberger, a lady now 91 years of age.   For a period of approximately twenty years, Mr. Lynch was the agent, business adviser, and property manager, of Mrs. Engelberger; and he also borrowed considerable sums of money from her at various times.   In June, 1955 Mrs. Engelberger filed her complaint against Lynch, praying, *inter alia*: (a)

that she have judgment against him and his wife[1] for the amounts due on certain notes and mortgages, together with foreclosure thereof; (b) that she have a complete accounting of Lynch's dealings as her fiduciary; and (c) that she have judgment against Lynch for all that he owed her as disclosed by the accounting. To the complaint there was filed an answer and a cross-complaint.

In October, 1955 Mrs. Annie Engelberger—on petition of her three daughters and three grandchildren— was declared mentally incompetent; and her daughter, Mrs. Tillie Engelberger Garnes, was appointed as guardian of Mrs. Engelberger and was substituted as plaintiff in the said suit that Mrs. Engelberger had filed. Various interlocutory orders were made[2]; and by agreement an accountant was appointed to audit the books.

Trial in the Chancery Court resulted in a decree of April 10, 1956, finding *inter alia:* (a) that Mrs. Annie Engelberger had been "since 1946 mentally incompetent and incapable of transacting business matters"; (b) that Lynch and wife had borrowed money from Mrs. Engelberger, evidenced by notes, at intervals from 1942 to 1950, and still owed Mrs. Engelberger a total balance on three notes of $13,975.27 and interest at 10% from February 2, 1956 until paid; (c) that certain mortgages executed by Lynch and wife to Mrs. Engelberger should be foreclosed; (d) that certain contracts and powers of attorney executed by Mrs. Engelberger to Lynch should be cancelled; (e) that Lynch was entitled to a deed to one property upon payment of a certain amount; and (f) that Lynch was liable for $752.35 damages he had inflicted on a building.

From this decree, Lynch and wife have appealed; and Mrs. Garnes, as Guardian, has cross appealed. The

[1] Mrs. Lynch was a party defendant because she had joined her husband in signing notes and mortgages to Mrs. Engelberger. Judgment was rendered against Mrs. Lynch for several such items; and she is an appellant here; but since Mr. Lynch is the principal party, we will refer to him as "the appellant."

[2] Lynch filed a cross complaint against Marion Gisler (daughter of Mrs. Engelberger) who responded with a cross complaint against Lynch. In the final decree the Chancery Court dismissed both cross complaints without prejudice, so this appeal does not involve the Lynch-Gisler controversy.

appellants have listed seven points on their direct appeal[3]; and the appellee has listed five points on her cross-appeal[4]. We group and discuss the points in suitable topic headings.

I. *The Amount Due By Lynch On The Notes To Mrs. Engelberger.* The record shows there were four notes executed by Lynch to Mrs. Engelberger:

Note No. 1 was dated April 24, 1942 for $3,800. The mortgage securing this note was duly released of record in November, 1942: so the Trial Court correctly held this note to have been fully satisfied and no judgment was rendered against Mr. Lynch on this note.

Note No. 2 was dated October 2, 1942 for $3,800. Lynch's pleadings admitted that this was a valid note, but he claimed many credits on it. The Chancery Court allowed credits totalling $1,348.69 and found that the balance of principal and interest due on February 2, 1956 was $5,940.65.

Note No. 3 was dated June 21, 1950 for $3,450. Lynch's pleadings admitted that this was a valid note, but he claimed many credits on it. The Court allowed credits totalling $1,450 and found that the balance of principal and interest due on February 2, 1956 was $3,080.

---

[3] These points are: I. Evidence Insufficient upon Which to Base Finding of Incompetency. II. Court Erred in Excluding Testimony of John L. Sullivan. III. Conduct and Actions of Appellees Refute the Charge of Incompetency. IV. Entire Absence of Proof of Unfair Dealings or Overreaching on Part of Appellant. V. So-called Audit is Worthless to Strike a Balance Between the Parties or to Arrive at Any Amount upon Which Judgment Could be Returned. VI. The Court Erred in Rendering a Judgment for Demolishing the Front of Building at 508-510 Main Street, North Little Rock, Arkansas. VII. Material Inconsistencies in Court's Findings and Final Decree.

[4] These points are: I. The ruling of the court that the purchase of the lot from the incompetent is a valid contract and not subject to cancellation is inconsistent and erroneous. II. Contracts with incompetents, except for necessities, are void *ab initio*. III. Appellee is entitled to have her title quieted as against the appellant without respect to improvements, especially since appellant has sought recovery of his improvements against a third party, which matter is not before this Court. IV. It is clear by a preponderance of the evidence that the appellant is guilty of violations of the fiduciary trust reposed in him, and that the court overlooked the fact that the contract of purchase carries fraud on the face of it. V. Appellant is, in effect, a trustee *ex maleficio;* and, as such, cannot recover for any improvements made by him upon this property.

Note No. 4 was dated July 13, 1950 for $3,200. Lynch's pleadings admitted that this was a valid note, but he claimed many credits on it. The Court found that there were no credits on this note and that the balance of principal and interest due on February 2, 1956 was $4,954.62.

Thus, the Court found that the total on notes Nos. 2, 3, and 4, due February 2, 1956, was $13,975.27; and Lynch says that he is entitled to many credits that the Chancery Court failed to allow him. When Lynch admitted that notes 2, 3 and 4 were valid, the burden devolved on him of proving payment. *Caldwell* v. *Hall,* 49 Ark. 508, 1 S. W. 62; *Barnett* v. *Bank of Pangburn,* 147 Ark. 500, 228 S. W. 369; *Toulmin & Toulmin* v. *Underwood,* 172 Ark. 813, 290 S. W. 377; and *Daugherty* v. *Merrifield,* 190 Ark. 537, 80 S. W. 2d 72. Mr. Lynch failed to discharge this burden beyond the amounts allowed by the Chancery Court. Early in the course of the litigation it became evident that there would have to be an audit of Mr. Lynch's books in order to learn of his dealings as Mrs. Engelberger's agent. Accordingly, *by agreement of both sides,* an order[5] was made on November 25, 1955 appointing Mr. O. B. Courtney to make the audit. Mr. Courtney undertook to audit Mr. Lynch's books, in keeping with the Court order; and on December 16, 1955 Mr. Courtney filed his 14-page report. He also testified in the case.

It is apparent that Mr. Lynch kept very inadequate records. There were no entries prior to November 16, 1948, and no entries after July, 1955. Furthermore, it

[5] The order recited in part: "On this day, by agreement of all parties hereto, it is ORDERED: O. B. Courtney, an accountant of the City of Little Rock, be and he is hereby authorized and directed by the Court to make an audit of the books and records of the plaintiff, *Anna* Engelberger, (sic) the defendants, S. J. Lynch and Theresa Lynch Raines, and the cross-defendant, Mary Gisler, with reference only to the dealings and transactions between the parties to this cause as set forth in the pleadings in said action. . . . Said O. B. Courtney is authorized and empowered to have access to and inspect all and only such records, books, receipts, cancelled checks, documents, bank accounts and all correspondence of all of the parties hereto that have reference to the dealings and transactions between them, that may in any way aid the court in arriving at a final determination of the controversy between the parties."

was impossible to determine whether certain expense items were paid on account of Mrs. Engelberger's property or for personal expense of Mr. Lynch on his own property. Not only was the burden on Mr. Lynch to prove any payments he claimed on his notes to Mrs. Engelberger, but also it was his duty as agent to keep an accurate record of his dealings for her. As stated in 2 Am. Jur. 226 ("Agency" § 286) on the duty of an agent to keep and render accounts:

"The duty of an agent to account for moneys of his principal coming into his hands is well recognized. As stated by the American Law Institute, unless otherwise agreed, an agent is subject to a duty to keep, and render to his principal an account of, money or other things which he has received or paid out on behalf of the principal."

In view of the duties of Mr. Lynch and the poor records that he kept, and the uncorroborated nature of his testimony, we cannot say that the Chancery Court was in error in its holding in regard to credits claimed by Mr. Lynch. So we affirm the decree as to amounts due on the notes.

II. *The Decree Ordering The Guardian To Execute A Deed.* The decree reads in part as follows:

"The prayer of the defendant S. J. Lynch for an order of this Court to require the incompetent to execute a deed to him to Lot 1, Block 16, Holt's Industrial Addition to North Little Rock is hereby granted. Tillie Engelberger Garnes, guardian of the estate of Annie Engelberger, shall forthwith execute said deed and convey said Lot to S. J. Lynch upon payment to said guardian of $1,450 together with interest on said sum . . ."

The appellee has cross appealed from this portion of the decree; but we affirm the said quoted portion of the decree on the cross appeal. The evidence did not show that Mrs. Engelberger was incompetent at the time of the contract. The evidence shows that the price for this property was fair at the time of the contract, and that Lynch had spent considerable money on the

property in reliance on the contract. We conclude that substantial equity was accomplished by the decree concerning this property.

III. *The Judgment Against Lynch For Damages.* The evidence showed that Lynch had ordered that the front of a business building in North Little Rock be torn down preparatory to having the front rebuilt. The Court found that by reason of Mr. Lynch's orders the building had been damaged a total of $1,205; and that Lynch had spent $452.65 on repairs on the property for which amount he was entitled to credit. After allowing the credit, the Court rendered judgment against Lynch of $752.35 as damages to the building.

We hold that the damage judgment was erroneous. Lynch had caused the front of the building to be torn down in order to abate a dangerous situation. Mr. J. P. Caldwell, Chief of the Fire Department of North Little Rock, testified that, to his personal knowledge, the building in question had been in existence fifty years or more; that in 1953 he first notified Mr. Lynch that the building was unsafe and would be condemned unless it was repaired; and that certain repairs were made, but that the dangerous condition of the front wall existed until Mr. Lynch tore it down in 1955[6]. It was not shown that Mr. Lynch had acted negligently or wrongfully in any way in this building matter; so the damage judgment of $752.35 against him is reversed and set aside.

---

[6] Here is a portion of Mr. Caldwell's testimony: "Q. Now do you remember the instance of Mr. Lynch having the brick torn out from the top there, Chief? A. Yes. Q. Have you had occasion to inspect those beams? A. Yes, sir. Q. Now will you tell the Court, Chief, what condition those beams are in and were in when he tore the brick out? A. Well, the front wall was leaning out there three or four inches and the roof had been bad and rain water had soaked in there and deteriorated the beams and he asked—he did make a statement that he was going to have it fixed. . . . Q. Were those beams in good condition or bad condition? A. Well, to a certain extent I would say they were in bad condition. Q. Do you think in repairing or rebuilding, those old beams should have been used? A. Well, some of them could, yes. Q. Did you notice the brick above them that were resting on those front beams? A. That's right, I did. Q. What condition were those brick in? A. Those brick were old bricks and they were deteriorated. Q. Were they tight or loose? A. They were loose. Q. Was there any danger of people passing there from those brick or the front leaning like it was? A. Well, they had two or three signs there and I advised them to take the signs down for, of course, I am no engineer or anything like that but I didn't think that the front wall was perfectly safe."

IV. *The Cancellation Of The Other Contracts Lynch Had Obtained From Mrs. Engelberger.* Lynch obtained several contracts from Mrs. Engelberger:

(a) On October 30, 1945 he persuaded her to sign a contract which gave him 16 years in which to sell the property owned by her at 508 Main Street in North Little Rock and also certain property she owned in Levy[7].

(b) On September 9, 1952 Mr. Lynch persuaded Mrs. Engelberger to execute to him an unlimited power of attorney to do as he wished with any and all of her property.

(c) On September 11, 1952 Lynch persuaded Mrs. Engelberger to give him a contract allowing him fifteen years to sub-divide and sell a 20-acre tract in Levy[8].

The Chancery Court cancelled all three of these contracts, as above referred to, and Lynch claims error. As regards the contracts of 1952, they are subject to cancellation because of Mrs. Engelberger's mental condition at the time of execution, all of which will be discussed in Topic V, *infra*. As regards the contract of October 30, 1945, we hold that it should have been cancelled as an imposition on Mrs. Engelberger. In 1945 Lynch had acted as Mrs. Engelberger's fiduciary for ten years and in such a position of trust and confidence he persuaded

---

[7] This contract reads: "For and in consideration of the services rendered and to be rendered by S. J. Lynch in selling or assisting me to sell or exchange the property described on the reverse side of this contract, of which I am the sole owner, I agree that S. J. Lynch shall have the sole and exclusive agency of sale for said property for a period of 16 years from date hereof, and thereafter until notified by me orally or in writing of its withdrawal from sale; and I hereby authorize them to sell or contract with purchaser for the sale and conveyance by warranty deed of said premises according to the price and terms herein given, title to be shown by abstract of title which I agree to furnish. If said property be sold or otherwise disposed of by Annie Engelberger during the above period, I agree to pay to their order the sum of $ being the customary commission of 5 per cent on the gross amount of said sale, or the value at which it may, with my consent, be exchanged for other property. I further agree to pay said commission to S. J. Lynch if said property be sold or otherwise disposed of by any other person, firm or corporation including the undersigned, during the above period, or after the above period, on information given, received, or obtained through this agency. (Signed) Mrs. Annie Engelberger."

[8] This contract was on the same form as the previously numbered exhibit.

a lady then past 80 years of age to give him an exclusive listing for a period of 16 years on her valuable property. In short, Lynch was getting all the benefit of whatever might happen to property values from 1945 to 1961, without being required to do anything during that time. It was unconscionable for him to take such a contract from Mrs. Engelberger in view of the relationship then existing. The Trial Court was correct in cancelling the 1945 contract; and the Trial Court was also correct in cancelling the 1952 contracts, in view of the matter now to be discussed.

V. *Mrs. Engelberger's Mental Condition.* In 1955 the Probate Court made an adjudication that Mrs. Engelberger was then mentally incompetent, and appointed her daughter, Mrs. Tillie Engelberger Garnes, as her guardian; and the guardian was substituted as the plaintiff in the pending litigation, which is now before us. Of course, the Probate adjudication is not *conclusively* binding on the Chancery Court in a case like the one at bar. (*Feild* v. *Koonce,* 178 Ark. 862, 12 S. W. 2d 772, 68 A. L. R. 1303 and annotation; *Schuman* v. *Westbrook,* 207 Ark. 495, 181 S. W. 2d 470; and *Dew* v. *Requa,* 218 Ark. 911, 239 S. W. 2d 603). So the Chancery Court heard a vast array of witnesses as to Mrs. Engelberger's mental condition in order to determine when she actually became mentally incompetent.

The Chancery Court found and decreed: "The Court finds that the said Annie Engelberger is now, and has been since 1946, mentally incompetent and incapable of transacting business matters". Appellant says that the date of 1946 is in error; and we agree that the preponderance of the evidence shows the date to have been later than 1946. Dr. E. J. Ritchie, Mrs. Engelberger's personal physician, was called as a witness by appellee. He testified that he had known Mrs. Engelberger for twenty years; that she suffered with hypertension, generalized arteriosclerosis, and arteriosclerotic heart disease; that he began to notice the failing of her faculties in about 1947; that her condition in 1950, as compared with 1956, would be a "thing of degree"; that she had progressively grown worse since 1947; and that she was senile.

There was testimony by many lay witnesses, some interested and some disinterested; but we find that Dr. Ritchie's testimony is the most enlightening evidence in the record on this matter of geriatrics. When a person has reached the age that Mrs. Engelberger had in 1952 and has her afflictions, then at times such a person might be normal and at other times abnormal. Such cases as *Puryear* v. *Puryear*, 192 Ark. 692, 94 S. W. 2d 695; and *Pernot* v. *King*, 194 Ark. 896, 110 S. W. 2d 539, shed light on such situations.

At all events, we cannot say that every act of Mrs. Engelberger after 1946 was the act of an incompetent: rather we hold that each act is to be tested as of its own date and surrounding circumstances. But beginning with 1952 the evidence shows Mrs. Engelberger to be totally mentally incompetent. Certainly the contracts of September 9, 1952 and September 11, 1952 must fail because of her mental condition.

VI. *Refused Testimony.* In connection with the mental condition of Mrs. Engelberger, the appellant complains of the refusal of the Court to allow Hon. John L. Sullivan to testify when called as a witness by appellant. Mr. Sullivan, as her attorney, had prepared a will for Mrs. Engelberger; and appellant called Mr. Sullivan to testify as to Mrs. Engelberger's mental condition at the time the will was executed. Mr. Sullivan did not desire to violate the confidence of his client and asked the Trial Court to protect him against being required to answer[9]. Also the appellee objected to the appellant interrogating Mr. Sullivan because of the relationship of attorney and client; and the Court ruled that Mr. Sullivan would not be required to testify.

Appellant complains of the Court's ruling; but the point is without foundation because the appellant made no offer to prove what the testimony of Mr. Sullivan would have been if he had been required to testify.

---

[9] Mr. Sullivan stated in this regard: "If the Court please. May I get my position clear in this matter. During the period of time that I knew Mrs. Engelberger and transacted business with her, I acted as her attorney. I am willing to give any information pertaining to any transaction where the Court will hold that I am not bound by my professional interest in the matter."

*Boland* v. *Stanley,* 88 Ark. 562, 115 S. W. 163; *Ward* v. *Ft. Smith Light & Traction Co.,* 123 Ark. 548, 185 S. W. 1085. So, even if Mr. Sullivan's testimony had been competent against the claim of confidential relationship between attorney and client — a point we need not decide—still appellant made no offer to show what Mr. Sullivan's testimony would have been.

## CONCLUSION

We affirm the Chancery Court on both direct appeal and cross appeal on every point except the damage judgment, as discussed in Topic III. The damage judgment is reversed and set aside; but, because the damage judgment is a very small portion of the case, we adjudge the costs of this Court against the appellant, S. J. Lynch. The costs in the Trial Court have already been adjudged against him by the decree of the Chancery Court.